**STATE of Missouri, Appellant,**

v.

**Scotty J. WEEKLY, Respondent.**

**No. WD 61086.**

Missouri Court of Appeals, Western District.

March 25, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 24, 2003.

Application for Transfer Denied July 1, 2003.

Jeremiah W. (Jay) Nixon, Attorney General, Greg A. Perry, Asst. Attorney General, Jefferson City, MO, for Appellant.

Jon M. Krebbs, Liberty, MO, for Respondent.

Before ROBERT G. ULRICH, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

The Department of Mental Health appeals the unconditional release pursuant to section 552.040 of Scotty J. Weekly. The Department contends that the trial court did not apply the correct standards in its decision. We agree that the trial court misapplied the law. The judgment is reversed.

### Statement of Facts

Scotty J. Weekly was a chronic user of intravenous amphetamines. On September 8, 1994, Weekly was in a psychotic state. While under the delusion that his family was in danger, Weekly commandeered a vehicle. Weekly forced an indi-

vidual, at gunpoint, to drive him various places in search of his family. Weekly was arrested in Jackson County and charged with Felonious Restraint, Armed Criminal Action, and Unlawful Use of a Weapon. Exhibiting mental disturbances, Weekly was examined by Dr. James Sales, a psychiatrist at Fulton State Hospital. Dr. Sales diagnosed Weekly as having an Axis I condition of Vascular Dementia, with Delusions, and an Axis III diagnosis of Cerebral Vascular Accident.[1]

On December 5, 1995, Weekly pleaded not guilty by reason of mental disease or defect to the charges against him. The Jackson County Circuit Court accepted his plea and committed Weekly to the custody of the Missouri Department of Mental Health ("Department"). Weekly was placed at the Fulton State Hospital for treatment; he was later transferred to the Northwest Missouri Psychiatric Rehabilitation Center ("Northwest") in St. Joseph, Missouri.

In 1998, Weekly fled Northwest without permission of the Department. He left the State of Missouri but soon returned to Northwest voluntarily. At the time of his return, Weekly appeared to have an altered mental state. Weekly admitted to using illegal drugs while he was away from the facility.

Weekly applied for a conditional release from the Buchanan County Circuit Court in 2000. The purpose of a conditional

release, as opposed to an unconditional release, is to give an opportunity to an insanity acquittee to demonstrate, under the conditions of the release, that he or she will not present a danger to self or others when reintegrated into the community. The return to the community is accomplished under conditions in order to test the thesis that the acquittee may be safely returned to society. The Department opposed the conditional release. The court ruled against the Department's position, granting Weekly a conditional release on November 13, 2000. Under the conditions of the release, Weekly was not allowed to own or operate a gun or a motor vehicle, not allowed to drink alcohol or use drugs of any kind not prescribed by a doctor, not allowed to leave the State of Missouri, not allowed to enter an establishment where the primary item for sale was alcohol, not allowed to associate with anyone who had a criminal record, and was required to attend two meetings a week of Alcoholic Anonymous or Narcotics Anonymous. Weekly was also not allowed to relocate or spend the night at a house that had not been approved by the Department. Any violations of the conditions could result in revocation of the conditional release.

The first conditional release was limited to six months. Apparently, Weekly successfully completed the first release.

1. The Diagnostic and Statistical Manual of Mental Disorders (DSM) is considered the authoritative manual for classification of mental disorders. The DSM provides a system for assessment on different levels, called axes, which refers to different domains of information that may help the clinician plan treatment and predict outcomes. An Axis I disorder is a biologically based disorder, such as mental disorders due to a medical condition or substance disorders. Axis II disorders are personality disorders, sometimes consisting of mental retardation, but usually refer to maladaptive behaviors, such as Obsessive–Compulsive Personality Disorder or Paranoid Personality Disorder. Axis III is for the reporting of current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder, such as injuries or diseases. Axis IV is for the reporting of social and environmental problems, such as educational and occupational problems. Axis V is for the reporting of the clinician's judgment of the individual's overall level of function.

Weekly immediately applied for a second conditional release. The court granted Weekly a second conditional release on May 31, 2001. The term of the second conditional release was also six months. The restrictions imposed on Weekly for the second conditional release were similar to the terms of the first conditional release but were somewhat less restrictive. For example, the court allowed Weekly to own and operate a motor vehicle.

This time, Weekly was guilty of numerous violations of required conditions. On August 3, 2001, two months after the second release began, Weekly left the house he occupied with his wife and did not return. He instead drove to Kansas City and stayed with his parents. Though Weekly continued to keep in contact with the staff at Northwest in accordance with a condition of his release, he refused to reveal his location. The staff at Northwest directed Weekly to return to the facility. He did not comply.

While at his parent's house, Weekly did not attend Alcoholics Anonymous or Narcotics Anonymous meetings. Accompanied by his mother, Weekly drove to Topeka, Kansas, to inquire about treatment at a drug rehabilitation facility located there. Weekly was deemed not eligible for the program and returned to his parents' house.

Weekly's case manager contacted the police because Weekly had broken conditions of his release but refused to return to the facility voluntarily. Weekly was arrested and returned to Northwest on August 14, 2001. His elopement had lasted ten days. After initially refusing to provide a urine sample, Weekly submitted to a urine drug screen on August 16, 2001. The sample tested positive for both amphetamine and methamphetamine.

The Department conducted an administrative revocation hearing. Weekly was represented by counsel and had the opportunity to present evidence. The hearing officer determined that Weekly had violated five conditions of his release by (1) staying overnight with his parents in Kansas City, Missouri, without prior approval; (2) failing to attend an AA/NA meeting after August 3, 2001; (3) having a positive drug screen; (4) using an illegal drug; and (5) leaving the State of Missouri without permission from his Forensic Case Monitor.

The hearing officer revoked Weekly's conditional release on September 4, 2001:

> Mr. Weekly testified during the hearing, that he finally realized, during his unauthorized absence, that he did need some type of therapy and counseling. Mr. Weekly does not believe that he would benefit from hospitalization and could receive treatment in the community.
>
> Unfortunately, Mr. Weekly's epiphany came a bit too late. I truly hope that Mr. Weekly will receive the treatment that he needs. However, Mr. Weekly clearly violated several conditions of his release, and I must revoke the conditional release.

Weekly then soon filed an Application for Unconditional Release with the Circuit Court of Jackson County. Weekly averred that he did not have, and in the reasonable future was not likely to have, a mental disease or defect that rendered him either dangerous to himself or others, or unable to conform his conduct to the requirements of the law. The Department and the State of Missouri filed objections.

The court conducted a hearing on December 20, 2001. Only one witness testified: Dr. James Reynolds. Dr. Reynolds, a psychiatrist at Northwest, had been treating Weekly since 1999. Reynolds testified that Weekly's initial diagnosis of de-

mentia due to vascular accident had been changed at the time of his earlier hearing for conditional release to Axis I diagnoses of polysubstance abuse and episodic and amphetamine induced psychotic disorder with delusions. Weekly, who originally had exhibited signs of paralysis and problems with motor function, no longer exhibited such symptoms.[2] At the time of the hearing for unconditional release, Weekly's Axis I diagnosis had changed yet again, now consisting of three disorders: adult antisocial behavior; polysubstance abuse, in remission in a controlled environment; and amphetamine-induced psychotic disorder with delusions, with onset during intoxication-recovered.

The Axis II disorder of antisocial personality disorder remained unchanged, as did the Axis III diagnosis, which included a number of physical disorders.

Reynolds testified that at the time Weekly was returned to the facility, he was not psychotic. He did, however, appear to be coming down from some type of drug use. Dr. Reynolds testified as follows:

Q: Is Mr. Weekly suffering from a mental defect or disease today?

A: At this point in time, no.

Q: Is there any way that you could determine whether or not someone in the future may be suffering from a mental disease or defect?

A: Let me rephrase your question. Are you asking can I predict at some point in the future when he may be suffering from mental disease? Not with absolute certainty, but we can make predictions of varying degrees of strength based on clinical information that we have at the time and past performance.

Weekly's counsel did not ask Dr. Reynolds to state an opinion as to whether at some point in the future Weekly was likely to suffer from a mental disease or defect. Dr. Reynolds acknowledged that antisocial behavior is not a mental disease. He also opined that polysubstance abuse would not be considered a mental disease or defect under Chapter 552. Dr. Reynolds stated that the amphetamine-induced psychotic disorder "could arguably be considered a mental disease or defect" under Chapter 552, but that currently Mr. Weekly is not suffering from the signs of the disorder. Dr. Reynolds stated that he was concerned about Weekly having an unconditional release. Dr. Reynolds stated he was concerned because on unconditional release Weekly would have no more obligation than any other citizen to avoid illegal drugs or to conform his conduct to the requirements of law, and there would be "zero opportunity" for the department to question Weekly's activities or to intervene if the department sees "such activities" either have happened or are about to happen.

Dr. Reynolds said he did not agree with unconditional release at this time because he likes to see the patient progress through "various security levels in good standing," then go through "a time on conditional release without violations," and then "apply for unconditional release after the person has demonstrated the ability to follow the rulings while being observed and supervised." Dr. Reynolds stated that

2. Reynolds hypothesized that Weekly's paralysis and poor motor function noted in 1995 may have been due to the side effects of the drug haloperidol, rather than the diagnosed cause of vascular injury. Haloperidol, a powerful antipsychotic, may cause severe movement disorders. The effects are rarely permanent, and often cease within one day after the medication is discontinued. Haloperidol was administered to Weekly upon his admission to Fulton State Hospital.

"in general I probably would want at least a year of satisfactory performance on conditional release before considering a person for unconditional release." He said that before he could support Weekly for unconditional release, he would look for assurances that Weekly had been compliant in "refraining from drugs to reduce future dangerousness."

Dr. Reynolds stated Weekly had done nothing since being hospitalized to work toward preparing for an unconditional release. The doctor stated that the only therapeutic activity that Weekly has participated in has been counseling with the nursing staff to reinforce the importance of following ward rules and policies. Dr. Reynolds said that as far as he knew Weekly had declined all other treatment activities offered to him and "actually for the most part even declined assessments based on his stated concerns that such information and such participation might be used against him." Dr. Reynolds stated that because Weekly relapsed in drug use while on conditional release and while he was on his own in elopement status, the doctor would be "very concerned" about Weekly's ability to remain free of substances "when he has no incentive to do so."

Dr. Reynolds stated he believed that if Weekly were granted an unconditional release, Mr. Weekly would use drugs again. "It is my opinion that he more than likely would relapse into illegal drug use and/or alcohol use at some point in the future." Dr. Reynolds stated he was unable to predict with any reasonable medical certainty "whether he would become psychotic as a result of that drug or alcohol use at any given time," but it was "certainly a strong possibility that a relapse into using intravenous methamphetamines, for instance, would pose a risk of psychotic symptoms in Mr. Weekly and likely very dangerous be-

havior in Mr. Weekly if he relapsed into that." Dr. Reynolds agreed that he could not state that Mr. Weekly is not likely to suffer from a mental disease of drug or substance induced psychosis at some point in the reasonable future." The doctor stated that if Weekly suffered that psychosis, he would be dangerous to others.

The Circuit Court of Jackson County issued its judgment on January 7, 2002, granting Weekly an unconditional release. The Department applied for a permanent stay of the unconditional release, which was denied. The Department now appeals Weekly's unconditional release.

### Standard of Review

■ The standard of review of the granting of an unconditional release is the same as that applied to other court tried cases. *State v. Revels,* 13 S.W.3d 293, 297 (Mo. banc 2000). The trial court's decision will be reversed only if there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

### Statutory Standard for Unconditional Release

■ The Department raises two points on appeal. Both points aver that the trial court erred in granting Weekly an unconditional release because the trial court did not base its decision on the standards mandated by statute. First, the Department argues that the trial court did not follow the standard set forth in section 552.040.9, RSMo 2000:

No committed person shall be unconditionally released unless it is determined through the procedures in this section that the person does not have, and in the reasonable future is not likely to have, a mental disease or defect ren-

dering the person dangerous to the safety of himself or others.

Second, the Department argues that the trial court did not consider the statutory factors set forth in section 552.040.7:

At a hearing to determine if the committed person should be unconditionally released, the court shall consider the following factors in addition to any other relevant evidence:

(1) Whether or not the committed person presently has a mental disease or defect;

(2) The nature of the offense for which the committed person was committed;

(3) The committed person's behavior while confined in a mental health facility;

(4) The elapsed time between the hearing and the last reported unlawful or dangerous act;

(5) Whether the person has had conditional releases without incident; and

(6) Whether the determination that the committed person is not dangerous to himself or others is dependent on the person's taking drugs, medicine or narcotics. . . . .

The burden of persuasion is on the party seeking an unconditional release to show, by clear and convincing evidence, that the person does not have, and in the reasonable future is not likely to have, a mental disease or defect rendering the person dangerous to the safety of himself or others. § 552.040.7(6). A plea of not guilty by reason of mental disease or defect supports an inference of continuing mental illness. *Jones v. United States,* 463 U.S. 354, 366, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). "It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill

and in need of treatment." *Id.* It is constitutional to confine a person who has been found not guilty by reason of mental disease or defect in a mental institution "until such time as he has regained his sanity or is no longer a danger to himself or society." *Id.* at 370, 103 S.Ct. 3043.

Weekly requested specific findings of fact and grounds for the decision in accordance with Rule 73.01. The court made the following Conclusions of Law:

1. It is a violation of the Fourteenth Amendment of the United States Constitution to confine an insanity acquittee unless he is both mentally ill and dangerous. *Foucha v. Louisiana* 504 U.S. 71, 112 S.Ct. 1780 [118 L.Ed.2d 437] (1992).

2. In Missouri, the standard for denying an unconditional release is whether the insanity acquittee has, and in the reasonable future is likely to have, a mental disease or defect rendering the person dangerous to self or others. Section 552.040.7 and 552.040.9 RSMo. See also *State v. Revels,* 13 S.W.3d 293 (Mo. Banc 2000).

3. If it is determined that the insanity acquittee has proven by clear and convincing evidence that he no longer suffers from a mental disease or defect then he may no longer be confined and the trial court is bound to release him. See *State v. Nash,* 972 S.W.2d 479, 484 [483] (Mo.App. 1998).

4. Petitioner has proven by clear and convincing evidence that he does not presently suffer from a mental disease or defect under Chapter 552 RSMo and therefore, this Court is required to grant his petition for unconditional release.

The trial court found that Weekly did not currently have a mental disease or

defect. The trial court did not, however, find that in the reasonable future Weekly was not likely to have a mental disease or defect rendering him dangerous to the safety of himself or others. Nor was such a finding possible from the evidence. Both findings are required by section 552.040.9 before an unconditional release may be granted. The trial court also made no findings in accordance with section 552.040.7. Many of the factors are relevant to this case, especially factor five (which concerns the matter of Weekly's behavior on conditional releases) and factor six (which concerns the matter of whether Weekly's mental health is dependent on his abstention from drug use).

The trial court's only finding is that Weekly no longer suffers from a mental illness. The court, therefore, concluded that he must be released. The trial court relies on the holdings of the cases of *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), and *State v. Nash*, 972 S.W.2d 479 (Mo.App.1998), for the proposition that the trial court need only find that the committed person no longer suffers from a mental illness in order to grant an unconditional release.

Failure to make required findings is grounds for reversal. See *State v. Revels*, 13 S.W.3d 293, 296 (Mo. banc 2000); Rule 73.01(c). Such failure is a misapplication of the law under *Murphy v. Carron*, 536 S.W.2d at 32. The trial court failed to find that Weekly is not likely to suffer from a mental disease or defect in the reasonable future. The court also failed to consider the required statutory factors. Dr. Reynolds, the only witness, stated that he could not say with reasonable certainty that Weekly was not likely in the reasonable future to be free of mental disease or defect rendering him dangerous to self or others. Weekly, nevertheless, argues that the trial court decision was proper because

Weekly showed he did not currently have a mental disease or defect, and, under constitutional standards, he must be unconditionally released. Therefore, we shall consider whether the court must grant an unconditional release when an acquittee has shown that he is not currently exhibiting signs of a mental disease or defect rendering him dangerous to himself or others, but has not shown that in the reasonable future he is not is likely to suffer from such a condition.

### State v. Nash

The trial court here found that: "If it is determined that the insanity acquittee has proven by clear and convincing evidence that he no longer suffers from a mental disease or defect then he may no longer be confined and the trial court is bound to release him," citing *State v. Nash*, 972 S.W.2d at 482. The trial court misapplies *Nash* to this case.

In *Nash*, the applicant had been charged with burglary but had pleaded not guilty by reason of mental disease or defect. *Id.* at 480. Nash was originally diagnosed with schizophrenia. At the time he applied for unconditional release, his diagnosis had been changed to antisocial personality disorder and substance abuse, both of which are not mental diseases under Chapter 552. *Id.* at 481. The testimony presented was that the original diagnosis was in error and that Nash had never suffered from schizophrenia. Thus, the court held that "[o]nce the trial court found that [Nash] 'does not presently have a mental disease or defect,' the trial court was bound to release Appellant." *Id.* at 482.

*Nash* is applicable to cases in which the mental patient, due to past misdiagnosis, was erroneously believed to have suffered from a mental illness. The *Nash* court explicitly stated:

This is not a case where the acquittee had a mental disease or defect upon admission to the state hospital. *And this is not a case where the mental disease or defect was in remission or was currently asymptomatic.* Rather, this is a case where the acquittee never did have a mental disease or defect and the evidence was clear and convincing that the acquittee, at the time of the hearing, *did not have a mental disease or defect* .... Once the trial court concluded that the Appellant does not have a mental disease or defect, the trial court should have then ordered the unconditional release of the defendant (emphasis added).

*Id.* at 483.

In this case, no claim of misdiagnosis was ever presented to the trial court. Dr. Reynolds did not assert that there had been a misdiagnosis, except to the extent that the motor dysfunction may have been misdiagnosed.[3] Reynolds had treated Weekly since 1999, but Weekly had been in Department custody since 1995. Here, the evidence shows that Weekly suffered from a mental disorder when originally admitted.

Also, this case differs from *Nash* in that in *Nash* the new diagnosis did not fall under the definition of "mental disease or defect" under Missouri statute. Section 552.010 provides the following definition:

The terms "mental disease or defect" include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms "mental

disease or defect" do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy. . . .

Nash's diagnosis was originally schizophrenia but was changed to antisocial disorder and substance abuse without psychosis, which the *Nash* court noted did not fit the definition of "mental disease or defect." *Id.* at 481. Thus, his final diagnosis indicated that Nash should never have been admitted into the mental health facility. That is not the case with Weekly. Weekly's initial diagnosis, vascular dementia, with delusions (an Axis I disorder), is a mental disease or defect under section 552.010. Weekly's revised diagnosis, as found by the trial court, included amphetamine-induced psychotic disorder with delusions, with onset during intoxication, which fits within the definition provided in section 552.010. According to the evidence presented, under either diagnosis Weekly was properly placed in mental health facility. Accordingly, *Nash* is inapplicable. *Nash*, 972 S.W.2d at 483.

### The Missouri Statute Is Constitutional

The Missouri Supreme Court has held that the statutory standard for unconditional release meets the holding in *Foucha*. *Revels*, 13 S.W.3d at 296. The holdings of the Supreme Court are binding on all lower courts. Mo. Const. art. 5, § 2. To the extent that the trial court failed to properly apply the statutory factors in section 552.040, the trial court misapplied the law and reversal is appropriate. *Murphy v. Carron*, 536 S.W.2d at 32.

In *Foucha*, the appellant had been committed to a state mental health facility after he was found not guilty by reason of insanity. 504 U.S. at 74, 112 S.Ct. 1780.

---

3.   See footnote 2 *supra.*

The appellant was denied a conditional release because he had antisocial personality disorder, a condition which rendered him a danger to himself and others, but which was not a mental disease or defect under Louisiana law. *Id.* The appellant was required, under Louisiana law, to prove both that he was no longer insane and that he was no longer dangerous to himself or others. *Id.* The Supreme Court held that it was unconstitutional to deny a conditional release to an individual who was no longer mentally ill on the *sole ground* that the individual was dangerous due to his antisocial personality. *Id.* at 82, 112 S.Ct. 1780. That is not the issue of this case. This case is about whether Weekly's mental illness, currently in remission, is likely to return once he is no longer supervised by the Department.

Section 552.040.9 states that: "[n]o committed person shall be unconditionally released unless it is determined ... that the person does not have, and in the reasonable future is not likely to have, a mental disease or defect rendering the person dangerous to the safety of himself or others." This statute does not contravene the holding in *Foucha.* See *Revels,* 13 S.W.3d at 293.

Conditional and unconditional releases are not the same. They serve different purposes, as is illustrated by Dr. Reynolds' testimony. The legislature created the different forms of release, conditional release and unconditional release, recognizing the value of tailoring the release program to the individual case. The factors to be considered in an unconditional release case differ from those to be considered in conditional release cases. In order to be conditionally released, one must only show that "the committed person is not likely to be dangerous to others while on conditional release." § 552.040.14.

The different standards for release are designed to balance the committed person's right to freedom from confinement against the community's interest in safety. So long as an insanity acquittee, even if mentally ill, is not a danger, the acquittee may be conditionally released. Section 552.040.14. However, a person on conditional release is subject to continuing supervision in order to impose conditions that will help ensure continued mental stability, such as the continued use of prescription medication. Continuing supervision also helps ensure that events that might aggravate a mental condition, such as illegal drug use, are not occurring. This type of release—a conditional release—is what the Supreme Court considered in *Foucha.*

Unconditional release involves a total loss of the Department's jurisdiction. After being unconditionally released, the patient is no longer under the supervision of the Department. As Dr. Reynolds noted, there remain no mechanisms to compel participation in counseling programs or to enforce monitoring for drug use. The legislature, aware that determining the status of a person's mental health and the potential dangers they present is an inexact science, intended that greater caution be exercised in unconditional release cases and specified that no unconditional release may be granted without a specific finding that the applicant (1) has no mental disease, *and* (2) in the reasonable future is not likely to have a mental disease rendering the applicant dangerous.

Section 552.040.9 places the burden on the acquittee to show that "in the reasonable future" he or she is not likely to have "a mental disease or defect rendering the person dangerous to the safety of themselves or others." This language is narrowly tailored to address circumstances in which a mental disease remains in remis-

sion while the acquittee is in a mental health facility and has no access to mind-altering drugs but, while released, is likely either to cease taking medication that prevents psychosis or to take drugs causing a psychosis.

It would not be helpful to require the unconditional release of a person suffering from paranoid schizophrenia who, while under appropriate medication, is asymptomatic, when that person has demonstrated a lack of appreciation for the need to take the medication and, while on conditional releases, has refused to take his medication. That would be true even if nothing tragic occurred during the conditional release. Similarly, it is not helpful to unconditionally release a potentially psychotic polysubstance abuser who, while confined in an institutional setting, is in remission, when that person has demonstrated an inability to control his impulses to take the very drugs which are likely to produce psychotic behavior. It would be good neither for the acquittee nor society. It is reasonable to believe that the Supreme Court never intended any such scenario in the application of *Foucha.* In the same way, our legislature has mandated that a trial court, when considering an unconditional release case, consider whether the determination that the committed person is not dangerous to himself or others "is dependent on the person's taking drugs, medicine or narcotics." § 552.040.7(6). The General Assembly has thus emphasized the safety of the community as an important consideration in the granting of an unconditional release. The propensity of a committed person to become a danger to the community while on unconditional release must be heavily weighed against the committed person's interest in personal liberty.

■ Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed. *Foucha,* 504 U.S. at 79, 112 S.Ct. 1780. The denial of the unconditional release must be tied to a mental disease or defect. *Nash,* 972 S.W.2d at 482. It is appropriate, under section 552.040, to deny unconditional release to a patient that has shown the inability to provide for his or her own mental health without supervision when there is a likelihood that the patient will become psychotic and dangerous.

Denial of an unconditional release does not mean that a committed person is left without remedy, subject to indeterminate confinement. The standard for conditional release is much lower; one must show only that he is not likely to be dangerous while on conditional release. Successful completion of conditional releases then becomes substantive evidence of a committed person's suitability for unconditional release.

There are many cases in which a person who is still mentally ill has obtained unconditional release. These are cases in which the acquittee will continue to suffer from a lifelong mental illness, but the mental illness is controlled by medication and the acquittee has established his or her commitment to the continued use of the medication. For instance, in *Jensen v. State,* 926 S.W.2d 925 (Mo.App.1996), a patient suffering from bipolar disorder was found eligible for unconditional release because the patient had uneventful conditional releases, continued to take his medication, and had not demonstrated dangerous behavior. *Id.* at 926–27. Unlike the present case, there was evidence in that case that in the reasonable future the patient was not likely to be dangerous. In *State v. Dudley,* 903 S.W.2d 581 (Mo.App.1995), this court held that a patient suffering from schizophrenia that was completely controlled by medication was eligible for unconditional release because of the suc-

cessful completion of conditional releases and the continued responsible use of medication.

Here, under the statutory test, the court was required to deny the unconditional release because Weekly failed to meet his burden of showing that he was not likely to be dangerous in the reasonable future. Weekly had demonstrated a propensity to use drugs, which the treating doctors testified would be likely to produce a psychotic state. During previous conditional releases, Weekly took amphetamines and other drugs. The evidence showed that Weekly's diagnosed mental defect, amphetamine-induced psychotic disorder with delusions, was currently in remission while he was under the care of the Department but was likely to return once Weekly resumed using amphetamines.

The Missouri statutory scheme of conditional and unconditional releases is constitutional. *Revels*, 13 S.W.3d at 293. Weekly proved that his mental disease was in remission, but he failed to meet the statutory requirement that he prove that in the reasonable future he is not likely to have a mental disease or defect rendering him dangerous to his own safety or that of others. Because the trial court misstated and misapplied the law in failing to require that Weekly meet the second part of his burden, and because Weekly failed to meet his burden, we reverse the grant of unconditional release.

ULRICH and HARDWICK, JJ., concur.