(Slip Opinion) OCTOBER TERM, 2006 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WHORTON, DIRECTOR, NEVADA DEPARTMENT OF CORRECTIONS *v.* BOCKTING

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–595. Argued November 1, 2006—Decided February 28, 2007

At respondent's trial for sexual assault on his 6-year-old stepdaughter, the court determined that the child was too distressed to testify and allowed respondent's wife and a police detective to recount her out-of-court statements about the assaults, as permitted by Nevada law, rejecting respondent's claim that admitting this testimony would violate the Confrontation Clause. He was convicted and sentenced to prison. On direct appeal, the Nevada Supreme Court found the child's statements constitutional under *Ohio* v. *Roberts*, 448 U. S. 56, then this Court's governing precedent, which had held that the Confrontation Clause permitted the admission of a hearsay statement made by a declarant unavailable to testify if the statement bore sufficient indicia of reliability, *id.*, at 66. Respondent renewed his Confrontation Clause claim in a subsequent federal habeas petition, which the District Court denied. While his appeal was pending in the Ninth Circuit, this Court overruled *Roberts* in *Crawford* v. *Washington*, 541 U. S. 36, holding that "testimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]," *id.,* at 59, and concluding that *Roberts*' interpretation of the Confrontation Clause was unsound, *id.,* at 60. Respondent contended that had *Crawford* been applied to his case, the child's statements would not have been admitted, and that it should have been applied because it was either an old rule in existence at the time of his conviction or a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," *Saffle* v. *Parks*, 494 U. S. 484, 495 (quoting *Teague* v. *Lane*, 489 U. S. 288, 311 (plurality opinion)). The Ninth

Circuit reversed, holding that *Crawford* was a new rule, but a watershed rule that applies retroactively to cases on collateral review.

*Held: Crawford* announced a new rule of criminal procedure that does not fall within the *Teague* exception for watershed rules. Pp. 8–14.

(a) Under *Teague*'s framework, an old rule applies both on direct and collateral review, but a new rule generally applies only to cases still on direct review and applies retroactively in a collateral proceeding only if it (1) is substantive or (2) is a watershed rule that implicates "the fundamental fairness and accuracy of the criminal proceeding." Respondent's conviction became final on direct appeal well before *Crawford* was decided, and *Crawford* announced a new rule, *i.e.,* "a rule that . . . was not '*dictated* by precedent existing at the time the defendant's conviction became final,' " *Saffle*, *supra,* at 488. It is flatly inconsistent with *Roberts,* which it overruled. "The explicit overruling of an earlier holding no doubt creates a new rule." *Saffle*, *supra,* at 488. Prior to *Crawford,* "reasonable jurists," *Graham* v. *Collins,* 506 U. S. 461, 467, could have concluded that *Roberts* governed the admission of testimonial hearsay statements made by an unavailable declarant. Pp. 8–9.

(b) Because *Crawford* announced a new rule and because that rule is procedural and not substantive, it cannot be applied here unless it is a "watershed rul[e]" that implicates "the fundamental fairness and accuracy of the criminal proceeding." This exception is "extremely narrow," *Schriro* v. *Summerlin*, 542 U. S. 348, 351, and since *Teague,* this Court has rejected every claim that a new rule has satisfied the requirements necessary to qualify as a watershed. The *Crawford* rule does not meet those two requirements. Pp. 10–14.

(1) First, the rule does not implicate "the fundamental fairness and accuracy of the criminal proceeding" because it is not necessary to prevent "an '"impermissibly large risk"'" of an inaccurate conviction, *Summerlin*, *supra,* at 356. *Gideon* v. *Wainwright*, 372 U. S. 335, the only case that this Court has identified as qualifying under this exception, provides guidance. There, the Court held that counsel must be appointed for an indigent defendant charged with a felony because, when such a defendant is denied representation, the risk of an unreliable verdict is intolerably high. The *Crawford* rule is not comparable to the *Gideon* rule. It is much more limited in scope, and its relationship to the accuracy of the factfinding process is far less direct and profound. *Crawford* overruled *Roberts* because *Roberts* was inconsistent with the original understanding of the Confrontation Clause, not because the *Crawford* rule's overall effect would be to improve the accuracy of factfinding in criminal trials. With respect to *testimonial* out-of-court statements, *Crawford* is more restrictive than *Roberts*, which may improve the accuracy of factfinding in some

criminal cases. But whatever improvement in reliability *Crawford* produced must be considered together with *Crawford*'s elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements. It is thus unclear whether *Crawford* decreased or increased the number of unreliable out-of-court statements that may be admitted in criminal trials. But the question is not whether *Crawford* resulted in some net improvement in the accuracy of factfinding in criminal cases, but, as the dissent below noted, whether testimony admissible under *Roberts* is so much more unreliable that, without the *Crawford* rule, "'the likelihood of an accurate conviction is seriously diminished,'" *Summerlin*, *supra,* at 352. *Crawford* did not effect a change of this magnitude. Pp. 11–13.

(2) Second, the *Crawford* rule did not "alter [this Court's] understanding of the *bedrock procedural elements* essential to the fairness of a proceeding," *Sawyer* v. *Smith*, 497 U. S. 227, 242. The Court has "not hesitated to hold that less sweeping and fundamental rules" than *Gideon*'s do not qualify. *Beard* v. *Banks*, 542 U. S. 406, 418. The *Crawford* rule, while certainly important, is not in the same category with *Gideon,* which effected a profound and "'sweeping'" change. *Beard*, *supra,* at 418. Pp. 13–14.

399 F. 3d 1010 and 408 F. 3d 1127, reversed and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–595

GLEN WHORTON, DIRECTOR, NEVADA DEPART-
MENT OF CORRECTIONS, PETITIONER *v.*
MARVIN HOWARD BOCKTING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 28, 2007]

JUSTICE ALITO delivered the opinion of the Court.

This case presents the question whether, under the rules set out in *Teague* v. *Lane*, 489 U. S. 288 (1989), our decision in *Crawford* v. *Washington*, 541 U. S. 36 (2004), is retroactive to cases already final on direct review.  We hold that it is not.

I

A

Respondent Marvin Bockting lived in Las Vegas, Nevada, with his wife, Laura Bockting, their 3-year-old daughter Honesty, and Laura's 6-year-old daughter from a previous relationship, Autumn.  One night, while respondent was at work, Autumn awoke from a dream crying, but she refused to tell her mother what was wrong, explaining: "'[D]addy said you would make him leave and that he would beat my butt if I told you.'" App. 119.  After her mother reassured her, Autumn said that respondent had frequently forced her to engage in numerous and varied sexual acts with him. *Ibid.*

The next day, Laura Bockting confronted respondent and asked him to leave the house. He did so but denied any wrongdoing. Two days later, Laura called a rape crisis hotline and brought Autumn to the hospital for an examination. At the hospital, Detective Charles Zinovitch from the Las Vegas Metropolitan Police Department Sexual Assault Unit attempted to interview Autumn but found her too distressed to discuss the assaults. Detective Zinovitch then ordered a rape examination, which revealed strong physical evidence of sexual assaults. See Findings of Fact and Conclusions of Law and Order in *Nevada* v. *Bockting*, Case No. C–83110 (D. Nev., Sept. 5, 1994); App. 47, 119.

Two days later, Detective Zinovitch interviewed Autumn in the presence of her mother, and at that time, Autumn provided a detailed description of acts of sexual assault carried out by respondent; Autumn also demonstrated those acts using anatomically correct dolls. *Id.,* at 47–48; 119. Respondent was then arrested, and a state grand jury indicted him on four counts of sexual assault on a minor under 14 years of age.

At respondent's preliminary hearing, Autumn testified that she understood the difference between a truth and a lie, but she became upset when asked about the assaults. Although she initially agreed that respondent had touched her in a way that "[she] didn't think he was supposed to touch [her]," *id.,* at 14, she later stated that she could not remember how respondent had touched her or what she had told her mother or the detective, *id.,* at 19–21. The trial court, however, found the testimony of Laura Bockting and Detective Zinovitch to be sufficient to hold respondent for trial.

At trial, the court held a hearing outside the presence of the jury to determine whether Autumn could testify. After it became apparent that Autumn was too distressed to be sworn in, *id.,* at 25–26, the State moved under Nev. Rev.

Stat. §51.385 (2003)[1] to allow Laura Bockting and Detective Zinovitch to recount Autumn's statements regarding the sexual assaults. App. 25–27. Under the Nevada statute, out-of-court statements made by a child under 10 years of age describing acts of sexual assault or physical abuse of the child may be admitted if the court finds that the child is unavailable or unable to testify and that "the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness." §51.385(1)(a). Over defense counsel's objection that admission of this testimony would violate the Confrontation Clause, *id.,* at 27–28, the trial court found sufficient evidence of reliability to satisfy §51.385.

As a result of this ruling, Laura Bockting and Detective Zinovitch were permitted at trial to recount Autumn's out-of-court statements about the assaults. Laura Bockting also testified that respondent was the only male who had had the opportunity to assault Autumn. In addition, the prosecution introduced evidence regarding Autumn's

---

[1] Section 51.385 provides, in relevant part:

"1. [A] statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child or any act of physical abuse of the child is admissible in a criminal proceeding regarding that act of sexual conduct or physical abuse if:

"(a) The court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and

"(b) The child testifies at the proceeding or is unavailable or unable to testify.

"2. In determining the trustworthiness of a statement, the court shall consider, without limitation, whether:

"(a) The statement was spontaneous;

"(b) The child was subjected to repetitive questioning;

"(c) The child had a motive to fabricate;

"(d) The child used terminology unexpected of a child of similar age; and

"(e) The child was in a stable mental state."

medical exam. Respondent testified in his own defense and denied the assaults, and the defense brought out the fact that Autumn, unlike many children her age, had acquired some knowledge about sexual acts, since she had seen respondent and her mother engaging in sexual intercourse and had become familiar with sexual terms. *Id.,* at 118.

The jury found respondent guilty of three counts of sexual assault on a minor under the age of 14, and the trial court imposed two consecutive life sentences and another concurrent life sentence.

## B

Respondent took an appeal to the Nevada Supreme Court, which handed down its final decision in 1993, more than a decade before *Crawford*.[2] In analyzing respondent's contention that the admission of Autumn's out-of-court statements had violated his Confrontation Clause rights, the Nevada Supreme Court looked to *Ohio* v. *Roberts*, 448 U. S. 56 (1980), which was then the governing precedent of this Court. See *Bockting* v. *State*, 109 Nev. 103, 847 P. 2d 1364 (1993) *(per curiam)*. *Roberts* had held that the Confrontation Clause permitted the admission of a hearsay statement made by a declarant who was unavailable to testify if the statement bore sufficient indicia of reliability, either because the statement fell within a firmly rooted hearsay exception or because there were "particularized guarantees of trustworthiness" relating to the statement in question. 448 U. S., at 66. Applying *Roberts*, the Nevada Supreme Court held that the admis-

---

[2] The State Supreme Court initially dismissed respondent's appeal in 1989, *Bockting* v. *State*, 105 Nev. 1023, 810 P. 2d 317 (unpublished table opinion), but we granted respondent's petition for a writ of certiorari and vacated and remanded the case for reconsideration in light of *Idaho* v. *Wright*, 497 U. S. 805 (1990), see *Bockting* v. *Nevada*, 497 U. S. 1021 (1990).

sion of Autumn's statements was constitutional because the circumstances surrounding the making of the statements provided particularized guarantees of trustworthiness. The Court cited the "natural spontaneity" of Autumn's initial statements to her mother, her reiteration of the same account to Detective Zinovitch several days later, her use of anatomically correct dolls to demonstrate the assaults, and her detailed descriptions of sexual acts with which a 6-year-old would generally not be familiar. *Bockting, supra,* at 109–112, 847 P. 2d, at 1368–1370.

### C

Respondent then filed a petition for a writ of habeas corpus with the United States District Court for the District of Nevada, arguing that the Nevada Supreme Court's decision violated his Confrontation Clause rights. The District Court denied the petition, holding that respondent was not entitled to relief under the habeas statute, 28 U. S. C. §2254(d), because the Nevada Supreme Court's decision was not "contrary to" and did not "involv[e] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Order in *Bockting* v. *Bayer*, No. CV–N–98–0764–ECR (Mar. 19, 2002), App. 69–70. Respondent then appealed to the United States Court of Appeals for the Ninth Circuit.

While this appeal was pending, we issued our opinion in *Crawford,* in which we overruled *Roberts* and held that "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]." 541 U. S., at 59. See also *Davis* v. *Washington,* 547 U. S. ___ (2006). We noted that the outcome in *Roberts*—as well as the outcome in all similar cases decided by this Court—was consistent with the rule announced in *Crawford,* but we concluded that

the interpretation of the Confrontation Clause set out in *Roberts* was unsound in several respects. See *Crawford, supra*, at 60 ("Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales"). First, we observed that *Roberts* potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause. 541 U. S., at 60. At the same time, we noted, the *Roberts* test was too "malleable" in permitting the admission of *ex parte* testimonial statements. 541 U. S., at 60. We concluded:

> "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right to confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." *Id.*, at 61.

## D

On appeal from the denial of his petition for writ of habeas corpus, respondent contended that if the rule in *Crawford* had been applied to his case, Autumn's out-of-court statements could not have been admitted into evidence and the jury would not have convicted him. Respondent further argued that *Crawford* should have been

applied to his case because the *Crawford* rule was either (1) an old rule in existence at the time of his conviction or (2) a "'watershed'" rule that implicated "the fundamental fairness and accuracy of the criminal proceeding." *Saffle* v. *Parks*, 494 U. S. 484, 495 (1990) (quoting *Teague*, 489 U. S., at 311 (plurality opinion)).

A divided panel of the Ninth Circuit reversed the District Court, holding that *Crawford* applies retroactively to cases on collateral review. *Bockting* v. *Bayer*, 399 F. 3d 1010, as amended, 408 F. 3d 1127 (2005). In the panel's lead opinion, Judge McKeown concluded that *Crawford* announced a new rule of criminal procedure, 399 F. 3d, at 1014–1016, but that the decision was nevertheless retroactive on collateral review because it announced a watershed rule that "rework[ed] our understanding of bedrock criminal procedure," *id.,* at 1016.[3] Judge Noonan concurred, but his preferred analysis differed from Judge McKeown's. Judge Noonan believed that *Crawford* did not announce a new rule, 399 F. 3d, at 1022–1024, but "[a]s an alternative to [this] analysis and in order to provide a precedent for [the] court," he "also concur[red] in Judge McKeown's analysis and opinion," *id.,* at 1024. Judge Wallace, concurring and dissenting, agreed with Judge McKeown that *Crawford* announced a new procedural rule but arguing that *Crawford* did not rise to the level of a watershed rule under this Court's jurisprudence. The Ninth Circuit denied rehearing en banc, with nine judges dissenting. 418 F. 3d 1055 (2005).

The panel's decision that *Crawford* is retroactive to cases on collateral review conflicts with the decision of every other Court of Appeals and State Supreme Court

--------

[3] Judge McKeown then held respondent merited habeas corpus relief under the Antiterrorism and Effective Death Penalty Act of 1996, because that statute incorporates our *Teague* v. *Lane,* 489 U. S. 288 (1989) retroactivity analysis. 399 F. 3d, at 1021–1022.

that has addressed this issue.[4]  We granted certiorari to resolve this conflict.  547 U. S. ___ (2006).

## II

### A

In *Teague* and subsequent cases, we have laid out the framework to be used in determining whether a rule announced in one of our opinions should be applied retroactively to judgments in criminal cases that are already final on direct review.  Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review.  See *Griffith* v. *Kentucky*, 479 U. S. 314 (1987).  A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle, supra,* at 495 (quoting *Teague, supra,* at 311 (plurality opinion)).

### B

In this case, it is undisputed that respondent's conviction became final on direct appeal well before *Crawford* was decided.  We therefore turn to the question whether *Crawford* applied an old rule or announced a new one.  A new rule is defined as "a rule that . . . was not '*dictated* by precedent existing at the time the defendant's conviction

_____

[4] See, *e.g., Lave* v. *Dretke*, 444 F. 3d 333 (CA5 2006); *Espy* v. *Massac*, 443 F. 3d 1362 (CA11 2006); *Murillo* v. *Frank*, 402 F. 3d 786 (CA7 2005); *Dorchy* v. *Jones,* 398 F. 3d 783 (CA6 2005); *Brown* v. *Uphoff*, 381 F. 3d 1219 (CA10 2004); *Mungo* v. *Duncan*, 393 F. 3d 327 (CA2 2004); *Edwards* v. *People,* 129 P. 3d 977 (Colo. 2006) (en banc); *Ennis* v. *State,* 122 Nev. ___, 137 P. 3d 1095 (2006); *Danforth* v. *State,* 718 N. W. 2d 451 (Minn. 2006); *State* v. *Williams*, 695 N. W. 2d 23 (Iowa 2005); *Chandler* v. *Crosby*, 916 So. 2d 728 (Fla. 2005); *In re Markel*, 154 Wash. 2d 262, 111 P. 3d 249 (2005).

became final.'"  *Saffle, supra,* at 488 (quoting *Teague, supra,* at 301 (plurality opinion); emphasis in original).

Applying this definition, it is clear that *Crawford* announced a new rule. The *Crawford* rule was not "dictated" by prior precedent. Quite the opposite is true: The *Crawford* rule is flatly inconsistent with the prior governing precedent, *Roberts,* which *Crawford* overruled. See *Davis,* 547 U. S., at \_\_\_ (slip op., at \_\_\_). "The explicit overruling of an earlier holding no doubt creates a new rule." *Saffle, supra,* at 488.

In concluding that *Crawford* merely applied an old rule, Judge Noonan relied on our observation in *Crawford* that the holdings in our prior decisions, including those that applied the *Roberts* rule, had been generally consistent with the rule announced in *Crawford* (and with the Framers' understanding of the meaning of the Confrontation Clause, which provided the basis for the *Crawford* decision). See 541 U. S., at 57–59. But the *Crawford* Court was quick to note that "the rationales" of our prior decisions had been inconsistent with the *Crawford* rule. *Id.,* at 60. "'The "new rule" principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.'" *Lockhart* v. *Fretwell,* 506 U. S. 364, 372–373 (1993) (quoting *Butler* v. *McKellar,* 494 U. S. 407, 414 (1990)). And it is stating the obvious to say that, prior to *Crawford,* "reasonable jurists," *Graham* v. *Collins,* 506 U. S. 461, 467 (1993), could have reached the conclusion that the *Roberts* rule was the rule that governed the admission of hearsay statements made by an unavailable declarant.

Because the *Crawford* rule was not dictated by the governing precedent existing at the time when respondent's conviction became final, the *Crawford* rule is a new rule.

### III
### A

Because *Crawford* announced a "new rule" and because it is clear and undisputed that the rule is procedural and not substantive, that rule cannot be applied in this collateral attack on respondent's conviction unless it is a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, 494 U. S., at 495 (quoting *Teague*, 489 U. S., at 311 (plurality opinion)). This exception is "extremely narrow," *Schriro* v. *Summerlin*, 542 U. S. 348, 352 (2004). We have observed that it is "'unlikely'" that any such rules "'ha[ve] yet to emerge,'" *ibid.* (quoting *Tyler* v. *Cain*, 533 U. S. 656 (2001); internal quotation marks omitted); see also *O'Dell* v. *Netherland*, 521 U. S. 151, 157 (1997); *Graham*, *supra,* at 478*; Teague*, *supra,* at 313 (plurality opinion). And in the years since *Teague*, we have rejected every claim that a new rule satisfied the requirements for watershed status. See, *e.g., Summerlin, supra* (rejecting retroactivity for *Ring* v. *Arizona*, 536 U. S. 584 (2002)); *Beard* v. *Banks*, 542 U. S. 406 (2004) (rejecting retroactivity for *Mills* v. *Maryland*, 486 U. S. 367 (1988)); *O'Dell, supra* (rejecting retroactivity for *Simmons* v. *South Carolina*, 512 U. S. 154 (1994)); *Gilmore* v. *Taylor*, 508 U. S. 333 (1993) (rejecting retroactivity for a new rule relating to jury instructions on homicide); *Sawyer* v. *Smith*, 497 U. S. 227 (1990) (rejecting retroactivity for *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985)).

In order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent "an '"impermissibly large risk"'" of an inaccurate conviction. *Summerlin, supra,* at 356; see also *Tyler*, 533 U. S., at 665. Second, the rule must "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Ibid.* (internal quotation marks and emphasis omitted). We consider each of these

requirements in turn.

## B

The *Crawford* rule does not satisfy the first requirement relating to an impermissibly large risk of an inaccurate conviction. To be sure, the *Crawford* rule reflects the Framers' preferred mechanism (cross-examination) for ensuring that inaccurate out-of-court testimonial statements are not used to convict an accused. But in order for a new rule to meet the accuracy requirement at issue here, "[i]t is . . . not enough . . . to say that [the] rule is aimed at improving the accuracy of trial," *Sawyer,* 497 U. S., at 242 or that the rule "is directed toward the enhancement of reliability and accuracy in some sense," *id.,* at 243. Instead, the question is whether the new rule remedied "an '"impermissibly large risk"'" of an inaccurate conviction. *Summerlin, supra,* at 366.

Guidance in answering this question is provided by *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), to which we have repeatedly referred in discussing the meaning of the *Teague* exception at issue here. See, *e.g., Beard, supra,* at 417; *Saffle, supra,* at 495; *Gilmore, supra,* at 364 (Blackmun, J., dissenting). In *Gideon,* the only case that we have identified as qualifying under this exception, the Court held that counsel must be appointed for any indigent defendant charged with a felony. When a defendant who wishes to be represented by counsel is denied representation, *Gideon* held, the risk of an unreliable verdict is intolerably high. See *Mickens* v. *Taylor,* 535 U. S. 162, 166 (2002); *United States* v. *Cronic,* 466 U. S. 648, 658–659 (1984); *Gideon, supra,* at 344–345. The new rule announced in *Gideon* eliminated this risk.

The *Crawford* rule is in no way comparable to the *Gideon* rule. The *Crawford* rule is much more limited in scope, and the relationship of that rule to the accuracy of the factfinding process is far less direct and profound.

*Crawford* overruled *Roberts* because *Roberts* was inconsistent with the original understanding of the meaning of the Confrontation Clause, not because the Court reached the conclusion that the overall effect of the *Crawford* rule would be to improve the accuracy of fact finding in criminal trials. Indeed, in *Crawford* we recognized that even under the *Roberts* rule, this Court had never specifically approved the introduction of testimonial hearsay statements. 542 U. S., at 57–60. Accordingly, it is not surprising that the overall effect of *Crawford* with regard to the accuracy of fact-finding in criminal cases is not easy to assess.

With respect to *testimonial* out-of-court statements, *Crawford* is more restrictive than was *Roberts*, and this may improve the accuracy of fact-finding in some criminal cases. Specifically, under *Roberts*, there may have been cases in which courts erroneously determined that testimonial statements were reliable. But see 418 F. 3d, at 1058 (O'Scannlain, J., dissenting from denial of rehearing en banc) (observing that it is unlikely that this occurred "in anything but the exceptional case"). But whatever improvement in reliability *Crawford* produced in this respect must be considered together with *Crawford'*s elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements. Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.

It is thus unclear whether *Crawford*, on the whole, decreased or increased the number of unreliable out-of-court statements that may be admitted in criminal trials. But the question here is not whether *Crawford* resulted in

some net improvement in the accuracy of fact finding in criminal cases. Rather, "the question is whether testimony admissible under *Roberts* is so much more unreliable than that admissible under *Crawford* that the *Crawford* rule is 'one without which the likelihood of an accurate conviction is *seriously* diminished.'" 399 F. 3d, at 1028 (Wallace, J., concurring and dissenting) (quoting *Summerlin*, 542 U. S., at 352 (internal quotation marks omitted; emphasis in original). *Crawford* did not effect a change of this magnitude.

### C

The *Crawford* rule also did not "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer*, *supra,* at 242 (internal quotations marks omitted and emphasis in original). Contrary to the suggestion of the Court of Appeals, see 399 F. 3d, at 1019 (relying on the conclusion that "the right of cross-examination as an adjunct to the constitutional right of confrontation" is a "bedrock procedural rul[e]"), this requirement cannot be met simply by showing that a new procedural rule is *based on* a "bedrock" right. We have frequently held that the *Teague* bar to retroactivity applies to new rules that are based on "bedrock" constitutional rights. See, *e.g., Beard*, 542 U. S., at 418. Similarly, "[t]hat a new procedural rule is 'fundamental' in some abstract sense is not enough." *Summerlin*, 542 U. S., at 352.

Instead, in order to meet this requirement, a new rule must itself constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding. In applying this requirement, we again have looked to the example of *Gideon*, and "we have not hesitated to hold that less sweeping and fundamental rules" do not qualify. *Beard*, *supra,* at 418.

In this case, it is apparent that the rule announced in

*Crawford*, while certainly important, is not in the same category with *Gideon*. *Gideon* effected a profound and "'sweeping'" change. *Beard*, *supra,* at 418 (quoting *O'Dell*, 521 U. S., at 167). The *Crawford* rule simply lacks the "primacy" and "centrality" of the *Gideon* rule, *Saffle*, 494 U. S., at 495, and does not qualify as a rule that "alter[ed] our understanding of the bedrock procedural elements essential to the fairness of a proceeding," *Sawyer*, 497 U. S., at 242 (internal quotation marks and emphasis omitted).

## IV

In sum, we hold that *Crawford* announced a "new rule" of criminal procedure and that this rule does not fall within the *Teague* exception for watershed rules. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*