**STATE v. ALSHAIF**

[219 N.C. App. 162 (2012)]

STATE OF NORTH CAROLINA v. SHAMAKH ALSHAIF

No. COA11-817

(Filed 21 February 2012)

**Criminal Law—guilty plea—attorneys not required to advise client of immigration consequences**

The trial court did not err in an assault with a deadly weapon inflicting serious injury case by concluding that the United States Supreme Court's decision in *Padilla v. Kentucky,* was inapplicable to defendant's case since it was a new rule of constitutional law that was not retroactively applicable on collateral review. Prior to *Padilla,* neither our state courts nor federal courts required counsel to advise a client of the immigration consequences of a guilty plea. *Padilla* did not establish a watershed rule of criminal procedure and did not fall within either of the *Teague* exceptions.

Appeal by Defendant from judgment entered 6 February 2007 and order entered 17 November 2010 by Judge Robert F. Floyd, Jr. in Superior Court, Robeson County. Heard in the Court of Appeals 15 November 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.*

*McKinney Justice Perry & Coalter, PA, by J. Scott Coalter, for Defendant-Appellant.*

McGEE, Judge.

Shamakh Alshaif (Defendant) pleaded guilty to one count of assault with a deadly weapon inflicting serious injury (AWDWISI) on 6 February 2007. Defendant received a suspended sentence of twenty-five to thirty-nine months and was placed on thirty-six months of supervised probation. Defendant filed a motion for appropriate relief (MAR) on 5 October 2010, arguing that his guilty plea was not intelligently and voluntarily made and that he had received ineffective assistance of counsel. The trial court denied Defendant's MAR in an order entered 17 November 2010. Defendant petitioned this Court for a writ of certiorari, which was granted by an order entered 2 May 2011.

STATE v. ALSHAIF

[219 N.C. App. 162 (2012)]

## I. Facts

Defendant, a lawful permanent resident of the United States, worked as a cashier at a convenience store in Maxton, North Carolina. A customer entered the store to purchase beer and cigarettes on 30 January 2006. An argument occurred between Defendant and the customer and Defendant shot the customer in the arm. Defendant was arrested on 31 January 2006 and charged with AWDWISI, and was indicted on that charge on 19 June 2006.

Defendant was represented by attorney David Branch (Mr. Branch). Defendant met with Mr. Branch several times and informed Mr. Branch of his lawful permanent resident status. Defendant stated in an affidavit filed with his MAR that Mr. Branch never advised him of the immigration consequences of a conviction for AWDWISI. Instead, Mr. Branch advised Defendant to plead guilty to AWDWISI. Defendant further stated in his affidavit that Mr. Branch never told him that "a conviction for AWDWISI was an 'aggravated felony' for immigration purposes" that would render Defendant deportable and would have other adverse consequences for Defendant's immigration status.

After Defendant completed his probationary sentence, he was arrested by agents of the U.S. Department of Homeland Security on 7 July 2010. Defendant was served with a notice to appear at removal proceedings. Defendant's MAR also included an affidavit from attorney Jeremy McKinney (Mr. McKinney), in which Mr. McKinney stated that Defendant had "been charged with removability solely due to a Robeson County, NC conviction for Felony Assault with a Deadly Weapon." Mr. McKinney also stated that Defendant was "not only clearly deportable, but [was] also ineligible for any relief from removal[,] . . . [and was] ineligible to re-seek permanent residency." Mr. McKinney further stated: "If [Defendant's] conviction is not vacated, I have no doubt [Defendant] will be ordered deported[.]"

Defendant argued in his MAR that Mr. Branch's counsel was ineffective on the grounds stated in *Padilla v. Kentucky*, ___ U.S. ___, 176 L. Ed. 2d 284 (2010). The trial court denied Defendant's MAR, finding that *Padilla* was inapplicable to Defendant's case because *Padilla* was decided after Defendant's conviction and that the rule announced in *Padilla* was a "new rule" and, therefore, was not retroactively applicable. Defendant appeals.

## II. Issues on Appeal

Defendant raises three issues on appeal: (1) whether the trial court erred in ruling that the holding of the United States Supreme Court in *Padilla* was not retroactively applicable to his case; (2) whether the trial court erred in determining that Defendant did not receive ineffective assistance of counsel; and (3) whether the trial court erred in determining that Defendant's guilty plea was made freely, voluntarily, and understandingly.

## III. Applicability of Padilla

### A. Standard of Review

We must first determine whether *Padilla* announced a "new rule," or merely applied an already applicable rule to a new set of facts. If we determine *Padilla* announced a new rule, then we must determine whether that new rule is applicable retroactively. North Carolina applies the test established by the United States Supreme Court in *Teague v. Lane*, 489 U.S. 288, 103 L. Ed. 2d 334 (1989), to determine "retroactivity for new federal constitutional rules of criminal procedure on state collateral review." *State v. Zuniga*, 336 N.C. 508, 513, 444 S.E.2d 443, 446 (1994).

The United States Supreme Court has stated that "[a] new rule is defined as 'a rule that . . . was not "*dictated* by precedent existing at the time the defendant's conviction became final." ' " *Whorton v. Bockting*, 549 U.S. 406, 416, 167 L. Ed. 2d 1, 11 (2007)' (citations omitted). Under the *Teague* test,

> new rules of criminal procedure may not be applied retroactively . . . unless they fall within one of two narrow exceptions. [*Teague*,] 489 U.S. at 310, 103 L. Ed. 2d at 356. Under the first exception, a new rule will be applied retroactively if it "place[s] an entire category of primary conduct beyond the reach of the criminal law," or "prohibit[s] the imposition of a certain type of punishment for a class of defendants because of their status or offense." *Sawyer v. Smith*, 497 U.S. 227, 241, 111 L. Ed. 2d 193, 211 (1990). Under the second exception, a new rule will be applied retroactively if it is a " 'watershed rule[] of criminal procedure' implicating the fundamental 'fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 108 L. Ed. 2d 415, 429 (1990) (quoting *Teague*, 489 U.S. at 311, 103 L. Ed. 2d at 356).

*Zuniga,* 336 N.C. at 511-12, 444 S.E.2d at 445.

### B. The Rule Created by *Padilla*

In *Padilla,* the United States Supreme Court addressed the issue of whether the Sixth Amendment guarantee of effective assistance of counsel required defense counsel to advise an immigrant defendant of the possibility of deportation before the immigrant defendant entered a guilty plea. The defendant in *Padilla* was a Honduran native who had been a lawful permanent resident of the United States for over forty years and had served in the United States military during the Vietnam War. *Padilla,* ___ U.S. at ___, 176 L. Ed. 2d at 289-90. The defendant had entered a guilty plea to the transportation of "a large amount of marijuana[,]" and was subject to removal from the United States as a result thereof. *Id.* at ___, 176 L. Ed. 2d at 290. In a post-conviction proceeding, the defendant claimed "that his counsel not only failed to advise him of this consequence prior to his entering the plea, but also told him that he ' "did not have to worry about immigration status since he had been in the country so long.:" ' " *Id.* at ___, 176 L. Ed. 2d at 290. The Supreme Court granted *certiorari* in order to determine whether the defendant's "counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." *Id.* at ___, 176 L. Ed. 2d at 290.

After a review of the history of immigration law in the United States, the Supreme Court began its discussion by concluding the following:

> These changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.

*Id.* at ___, 176 L. Ed. 2d at 292-93. *Citing Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674 (1984), the Supreme Court further concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. [And, therefore,] *Strickland* applies to [the defendant's] claim." *Padilla,* ___ U.S. at ___, 176 L. Ed. 2d at 294.

The Supreme Court then applied the *Strickland* test to determine whether the performance of attorneys who failed to advise about the possibility of removal " 'fell below an objective standard of reason-ableness.' " *Id.* at ___, 176 L. Ed. 2d at 294 (quoting *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693). The Court observed that "[t]he first prong—constitutional deficiency—is necessarily linked to the prac-tice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevail-ing professional norms.' " *Padilla*, ___ U.S. at ___, 176 L. Ed. 2d at 294 (citation omitted). The Court also observed that

> "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determin-ing what is reasonable[,]" . . . [and] may be valuable measures of the prevailing professional norms of effective representa-tion, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.

*Id.* at ___, 176 L. Ed. 2d at 294 (citations omitted).

The Supreme Court stated that "[t]he weight of prevailing profes-sional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* at ___, 176 L. Ed. 2d at 294. The Court also observed in *Padilla* that "[i]n the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for [the defendant's] conviction." *Id.* at ___, 176 L. Ed. 2d at 295. Conceding that "[t]here will . . . undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain[,]" the Court noted that "[t]he duty of the private practitioner in such cases is more limited." *Id.* at ___, 176 L. Ed. 2d at 296. The Court concluded that "[w]hen the law is not succinct and straightforward . . . a crimi-nal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigra-tion consequences." *Id.* at ___, 176 L. Ed. 2d at 296. However, "when the deportation consequence is truly clear, as it was in [*Padilla*], the duty to give correct advice is equally clear." *Id.* at ___, 176 L. Ed. 2d at 296.

The Court then rejected the Solicitor General's request "to conclude that *Strickland* applie[d] to [the defendant's] claim only to the extent that he has alleged affirmative misadvice." *Id.* at ___, 176 L. Ed. 2d at 296. The Court ultimately held that "counsel must

inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less." *Id.* at ___, 176 L. Ed. 2d at 299.

*Padilla* was a seven to two decision, accompanied by a concurring opinion authored by Justice Alito and joined by Chief Justice Roberts. A dissenting opinion was authored by Justice Scalia and was joined by Justice Thomas. In his concurring opinion, Justice Alito wrote that he agreed with the majority to the extent that an attorney "must (1) refrain from unreasonably providing incorrect advice and (2) advise the defendant that a criminal conviction may have adverse immigration consequences and that, if the alien wants advice on this issue, the alien should consult an immigration attorney." *Id.* at ___, 176 L. Ed. 2d at 299 (Alito, J., concurring). However, Justice Alito did not "agree with the Court that the attorney must attempt to explain what those consequences may be." *Id.* at ___, 176 L. Ed. 2d at 299-300 (Alito, J., concurring). Justice Alito further observed that:

> Until today, the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction. *See, e.g., United States v. Gonzalez,* 202 F.3d 20, 28 (CA1 2000) (ineffective-assistance-of-counsel claim fails if "based on an attorney's failure to advise a client of his plea's immigration consequences"); *United States v. Banda,* 1 F.3d 354, 355 (CA5 1993) (holding that "an attorney's failure to advise a client that deportation is a possible consequence of a guilty plea does not constitute ineffective assistance of counsel"); *see* generally Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 699 (2002) (hereinafter Chin & Holmes) (noting that "virtually all jurisdictions"—including "eleven federal circuits, more than thirty states, and the District of Columbia"—"hold that defense counsel need not discuss with their clients the collateral consequences of a conviction," including deportation).

*Id.* at ___, 176 L. Ed. 2d at 300 (Alito, J., concurring).

### C. Analysis

We begin by noting that the question of whether *Padilla* created a new rule and, if so, whether the rule is retroactively applicable

under *Teague*, has been addressed by several state appellate courts, federal district courts, and federal circuit courts of appeal. *Compare Chaidez v. United States*, 655 F.3d 684, 689 (7th Cir. 2011) (holding retroactivity jurisprudence demonstrated "considerations [that] convince us that *Padilla* announced a new rule"); *United States v. Orocio*, 645 F.3d 630, 641 (3d Cir. 2011) ("We therefore hold that, because *Padilla* followed directly from *Strickland* and long-established professional norms, it is an 'old rule' for *Teague* purposes and is retroactively applicable on collateral review."); *United States v. Chang Hong*, No. 10-6294, ___ F.3d ___, ___, 2011 WL 3805763, *7 (10th Cir. 2011) ("We disagree [with *Orocio*] and believe *Padilla* marked a dramatic shift when it applied *Strickland* to collateral civil consequences of a conviction—a line courts had never crossed before."). *See also Com. v. Clarke*, 949 N.E.2d 892, 903 (Mass. 2011) (holding that *Padilla* "is the definitive application of an established constitutional standard on a case-by-case basis, incorporating evolving professional norms (on which the standard relies) to new facts. It is not the creation of a new constitutional rule."); and *Barrios-Cruz v. State*, 63 So.3d 868, 873 (Fla.App. 2 Dist. 2011) ("While we recognize that *Padilla* represents an important development enumerating both a new right for defendants and a new duty for counsel, we do not find that it rises to the level of those rare 'fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding.' ").

In determining whether *Padilla* is retroactively applicable, we find the reasoning of the Tenth Circuit in *Chang Hong* persuasive and join with those courts holding that *Padilla* announces a new rule of constitutional law and is not retroactively applicable on collateral review. Under *Teague*, a rule is new if it " 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not *'dictated* by precedent existing at the time the defendant's conviction became final.' " *Graham v. Collins*, 506 U.S. 461, 467, 122 L.Ed.2d 260, 269 (1993) (quoting *Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349). A rule is old if a "court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156, 138 L. Ed. 2d 351, 358 (citation omitted).

In *Chang Hong*, the Tenth Circuit Court of Appeals conceded that *Padilla* was "grounded in *Strickland*," but nonetheless concluded that *Padilla* created a new rule. *Chang Hong*, ___ F.3d at ___, 2011

WL 3805763 at *7. The Tenth Circuit noted that "[b]efore *Padilla,* most state and federal courts had considered the failure to advise a client of potential collateral consequences of a conviction to be outside the requirements of the Sixth Amendment." *Id.* at ____, 2011 WL 3805763 at *6. The court further observed that "[a]ll of these courts . . . thought the rule in *Padilla* was not dictated or compelled by Court precedent. It goes without saying these are some of the 'reasonable jurists' we must survey to determine if *Padilla* is a new rule." *Id.* at ____, 2011 WL 3805763 at *6.

The Tenth Circuit also analyzed the concurring and dissenting opinions in *Padilla*:

> *Padilla,* a 7–2 decision, generated both a strong concurrence and dissent. In a concurrence, Justice Alito (joined by Chief Justice Roberts) stated "the Court's decision marks a major upheaval in Sixth Amendment law" and noted the majority failed to cite any precedent for the premise that a defense counsel's failure to provide advice concerning the immigration consequences of a criminal conviction violated a defendant's right to counsel. *Padilla,* [___ U.S. at___, 176 L. Ed. 2d at 304] (Alito, J., concurring in judgment); *see also id.* at [____, 176 L. Ed. 2d at 300] (noting the majority's "dramatic departure from precedent"); *id.* at [___, 176 L. Ed. 2d at 304] ("[T]he Court's view has been rejected by every Federal Court of Appeals to have considered the issue thus far."); *id.* at [___, 176 L. Ed. 2d at 305] ("The majority seeks to downplay its dramatic expansion of the scope of criminal defense counsel's duties under the Sixth Amendment.").
>
> Similarly, Justice Scalia in a dissent (joined by Justice Thomas), argued the Sixth Amendment right to counsel does not extend to "advice about the collateral consequences of conviction" and that the Court, until *Padilla,* had limited the Sixth Amendment to advice directly related to defense against criminal prosecutions. *Id.* at [____, 176 L. Ed. 2d at 308] (Scalia, J., dissenting); *see also id.* at [____, 176 L. Ed. 2d at 308-09] ("There is no basis in text or in principle to extend the constitutionally required advice regarding guilty pleas beyond those matters germane to the criminal prosecution at hand."). We take the concurrence and dissent as support for our conclusion that reasonable jurists did not find the rule in *Padilla* compelled or dictated by the Court's prior precedent.

*Id.* at \_\_\_, 2011 WL 3805763 at *6.

The Tenth Circuit concluded its analysis by noting the following: "While the Supreme Court had never foreclosed the application of *Strickland* to collateral consequences of a conviction, it had never applied *Strickland* to them either." *Id.* at \_\_\_, 2011 WL 3805763 at *7. The Tenth Circuit concluded that "a reasonable jurist at the time of [the defendant's] conviction would not have considered Supreme Court precedent to compel the application of *Strickland* to the immigration consequences of a guilty plea. Indeed, we as a court did not feel so compelled prior to *Padilla*." *Id.* at \_\_\_, 2011 WL 3805763 at *7.

Persuaded by the reasoning of *Chang Hong*, we conclude that *Padilla* announced a new rule. Prior to *Padilla*, neither our state courts nor federal courts had interpreted *Strickland* as requiring counsel to advise a client of the immigration consequences of a guilty plea. *See e.g., Padilla,* \_\_\_ U.S. at \_\_\_, 176 L. Ed. 2d at 300 (Alito, J., concurring) ("Until today, the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction."). We are aware that *Strickland* is a fact-specific test, and must naturally evolve over time as practical norms and underlying legal consequences change. *Id.* at \_\_\_, 176 L. Ed. 2d at 294-95. However, we find that *Padilla* was an application of *Strickland* that would have been unreasonable to expect attorneys to have fore-seen—especially those attorneys unfamiliar with immigration law. We therefore hold that *Padilla* announced a new rule.

### D. The *Teague* Exceptions

Having determined that *Padilla* announced a new rule, we must determine whether one of the exceptions set forth under *Teague* applies. "A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a ' "watershed rul[e] of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.' " *Whorton*, 549 U.S. at 416, 167 L. Ed. 2d at 10-11 (citation omitted).

"The rule in *Padilla* is procedural, not substantive. It regulates the manner in which a defendant arrives at a decision to plead guilty." *Chang Hong,* \_\_\_ F.3d at \_\_\_, 2011 WL 3805763 at *8. We agree with the Tenth Circuit and therefore proceed to analyze the second exception under *Teague*: whether *Padilla* created a "watershed rule of criminal procedure." The Supreme Court has noted that "[t]his excep-

tion is 'extremely narrow,' . . . [and] observed that it is ' "unlikely" ' that any such rules ' "ha[ve] yet to emerge[.]" ' " *Whorton*, 549 U.S. at 417, 167 L. Ed. 2d at 11-12 (citations omitted). The Supreme Court has also observed that "in the years since *Teague*, [it has] rejected every claim that a new rule satisfied the requirements for watershed status." *Id.* at 418, 167 L. Ed. 2d at 12.

In *Whorton*, the Supreme Court noted that "[i]n order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent 'an " 'impermissibly large risk' " ' of an inaccurate conviction. Second, the rule must 'alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.' " *Id.* (citations omitted).

Again, we find the reasoning of *Chang Hong* to be sound:

> *Padilla* does not concern the fairness and accuracy of a criminal proceeding, but instead relates to the deportation consequences of a defendant's guilty plea. The rule does not affect the determination of a defendant's guilt and only governs what advice defense counsel must render when his noncitizen client contemplates a plea bargain. *Padilla* would only be at issue in cases where the defendant admits guilt and pleads guilty. In such situations, because the defendant's guilt is established through his own admission—with all the strictures of a Rule 11 plea colloquy—*Padilla* is simply not germane to concerns about risks of inaccurate convictions or fundamental procedural fairness.

*Chang Hong*, ____ F.3d at ____, 2011 WL 3805763 at *9. We therefore conclude that *Padilla* did not establish a watershed rule of criminal procedure and thus does not fall within either of the *Teague* exceptions.

## IV.  Conclusion

*Padilla* raises the question of the extent to which attorneys can be expected to anticipate the expansion of their obligations under *Strickland* and the Sixth Amendment. We conclude that *Padilla* was a significant departure from prior requirements and hold that the decision therefore created a new rule, the retroactive application of which would be unreasonable. We therefore hold that the trial court did not err by concluding that *Padilla* was inapplicable to Defendant's case. Having rejected Defendant's argument concerning *Padilla*, we need not address Defendant's remaining arguments

which were based thereon. We therefore affirm the trial court's denial of Defendant's MAR.

Affirmed.

Judges STEELMAN and ERVIN concur.