**Michael TAYLOR, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. SC 88063.**

Supreme Court of Missouri,
En Banc.

Aug. 26, 2008.

William J. Swift, Office of the Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for Respondent.

LAURA DENVIR STITH, Chief Justice.

Michael Taylor was convicted and sentenced to death for the murder of his cellmate at Potosi Correctional Center. After his sentence was affirmed on direct appeal, he sought post-conviction relief. He asserted, among other things, that the prosecuting attorney violated his due process rights by failing to disclose favorable impeachment evidence and that his trial attorneys provided him with ineffective assistance of counsel. The motion court overruled the motion.

This Court concludes that the motion court clearly erred in overruling Mr. Tay-

lor's motion as to his claim for penalty phase relief. The prosecution suppressed favorable impeachment evidence that it was plainly required to disclose to Mr. Taylor by Missouri's discovery rules and an express order of the trial court. Although this Court cannot conclude that the motion court clearly erred in concluding that this evidence was not material to Mr. Taylor's conviction, the Court concludes that if the prosecutor had disclosed this favorable evidence, there is a reasonable likelihood that the outcome of the penalty phase proceeding may have been different.

Furthermore, this Court concludes that Mr. Taylor's counsel provided him with ineffective assistance at the penalty phase. The only mitigation testimony they presented at the penalty phase was from the superintendent of the correctional facility where Mr. Taylor was incarcerated, who testified that Mr. Taylor would present minimal risk to correctional officers and other inmates under his conditions of confinement. In a prison murder case, where there was unutilized but abundant and compelling mitigation evidence regarding Mr. Taylor's abusive upbringing and life-long struggles with mental illness, this decision was constitutionally unreasonable. Had trial counsel presented the available mitigation evidence, there is a reasonable likelihood that the outcome of the penalty phase proceeding may have been different. The motion court clearly erred in concluding otherwise.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Mr. Taylor was incarcerated at Potosi Correctional Center after being sentenced to life without parole for committing first-degree murder and forcible rape of a high school classmate. At Potosi, he was required to share a cell with Shackrein Thomas. On October 3, 1999, just prior to the routine 10 p.m. inmate "count," Mr. Taylor summoned the guards to his cell where they discovered Mr. Thomas' body.

Mr. Thomas' body was found on the cell floor with a bite mark in the middle of his back. His right eye had been nearly dislodged from the eye socket. There were abrasions present on his abdomen and left cheek, and his left eye was swollen. Mr. Taylor admitted to strangling Mr. Thomas. He stated to a department of corrections investigator that his "father" from the "dark side" had instructed him to "send" Mr. Thomas to him. Appellant denied that this voice commanded him to kill Mr. Thomas, but he knew what sending Mr. Thomas to his father meant that he had to do.

On November 30, 1999, Mr. Taylor was transferred from Potosi Correctional Center to the Biggs Correctional Unit at Fulton State Hospital. Biggs is a maximum security unit of the forensic psychiatric hospital. Among its patients are individuals who have been charged with violent crimes and persons with severe mental illness who are in the custody of the department of corrections. During his stay at Biggs, Mr. Taylor was diagnosed with paranoid schizophrenia. When Mr. Taylor was discharged from Biggs and returned to the department of corrections, his diagnoses were paranoid schizophrenia in partial remission and antisocial personality disorder.

This was not Mr. Taylor's first indication that he was afflicted with mental health problems. In 1986, Mr. Taylor, then age 7, first received a psychological examination at St. Louis University. When Mr. Taylor was 9, he received outpatient treatment at Washington University's adolescent psychiatry center for several months. At age 10, his school counselor was called to intervene to bring Mr. Taylor off the

ledge of an upper story window, where he was threatening to jump. At age 12, Mr. Taylor received inpatient mental health treatment and was diagnosed with post-traumatic stress disorder stemming from his father's violent and abusive behavior, both toward Mr. Taylor and Mr. Taylor's mother. Around this same time, his family was sufficiently concerned about his well-being that they attempted an exorcism. In 1998, while in prison for the murder of his high school classmate in 1995, Mr. Taylor was diagnosed with major depression with psychotic features.

Mr. Taylor's case went to trial in January 2003. The defense argued that although Mr. Taylor killed Mr. Thomas, he should be found not guilty by reason of a mental disease or defect that excused him from responsibility for the killing. "A 'not guilty by reason of mental disease or defect excluding responsibility' ... defense requires the defendant to comply with special notice provisions and injects into the case an issue on which defendant has the burden of proof." *State v. Walkup*, 220 S.W.3d 748, 756 (Mo. banc 2007). In order to prevail on this defense, the defendant must show that at the time of the crime he lacked the capacity to appreciate the wrongfulness of his conduct. Sec. 552.030.1. "If defendant succeeds on his affirmative defense, he is absolved of criminal responsibility." *Walkup*, 220 S.W.3d at 756. Consequently, the guilt phase evidence primarily consisted of expert testimony as to Mr. Taylor's mental status.

The defense introduced testimony from five mental health experts: Dr. John Rabun, a psychiatrist who evaluated Mr. Taylor for the purposes of determining his mental state at the time of the murder; Dr. William Eikerman, a psychiatrist who treated Mr. Taylor at Biggs Correctional Unit at Fulton State Hospital; Mr. Gary Selbert, a licensed counselor and the chief of mental health at Potosi Correctional Center; Dr. Bruce Harry, a psychiatrist who treated Mr. Taylor at Biggs; and Dr. Ahsan Syed, a psychiatrist at Biggs who treated Mr. Taylor in 1998. These witnesses testified that Mr. Taylor was suffering from paranoid schizophrenia in which he had auditory hallucinations and committed delusional acts of self-mutilation and that Mr. Taylor was not malingering. Of these five witnesses, only one, Dr. Rabun, testified that Mr. Taylor lacked the capacity to know and appreciate the nature, quality, or wrongfulness of his conduct at the time of the murder. The parties also stipulated that the prison staff was administering Trazadone, an anti-depressant medication, to Mr. Taylor at the time of the murder, although there was evidence he was not taking it before the murder.

In rebuttal, the state introduced testimony from three experts: Dr. Christy Blanchard, a clinical psychologist who administered a test to Mr. Taylor in October 2001; Dr. Richard Scott, a forensic psychologist who evaluated Mr. Taylor's competence to stand trial in 1996 for his classmate's murder; and Dr. David Vlach, a forensic psychiatrist who evaluated Mr. Taylor in fall 2001 to determine his competency to stand trial and in spring 2002 to determine his mental state at the time of the crime. Dr. Blanchard testified that the personality test she administered to Mr. Taylor rendered invalid results that might suggest malingering. Despite Mr. Taylor's long history of mental health issues and treatment, Drs. Scott and Vlach both testified that Mr. Taylor suffered from no mental health problems, but rather was malingering.

The state also introduced testimony from an inmate, Scott Perschbacher. Mr. Perschbacher testified that he had read notes that were passed from another inmate, Jerome White–Bey, to Mr. Taylor.

According to Mr. Perschbacher, these notes, which are called "kites" in prison slang, are passed from cell to cell through an elaborate "cadillac" system involving strings and weights. Although Mr. White–Bey's cell was on the opposite end of the wing from Mr. Taylor's, and Mr. Perschbacher's cell was adjacent to Mr. Taylor's, Mr. Perschbacher testified that he agreed to assist Mr. White–Bey to pass a "kite" to Mr. Taylor. Mr. Perschbacher testified that Mr. White–Bey instructed Mr. Taylor in the notes to "continue the nut role and doing crazy things so they will think he's crazy." He also testified that he was not given favorable treatment on his pending cases in exchange for his testimony against Mr. Taylor.

During the jury's deliberations at the guilt phase of the trial, the foreman sent a note to the judge requesting "all psychiatric and psychological records presented by the defense." Rather than submitting the records themselves, Mr. Taylor had proffered the testimony of Dr. Rabun, who relied upon the records in reaching his conclusion. Consequently, there were no records for the trial court to deliver to the jury.

The jury rejected defendant's insanity defense and found him guilty of first-degree murder. At the penalty phase, the state called the Florissant police detective who participated in the investigation and prosecution of the previous murder, for which Mr. Taylor was incarcerated at the time of the present crime. Through this witness, the details of the murder Mr. Taylor committed when he was fifteen were presented to the jury. The only evidence defense counsel presented was the videotaped deposition testimony of the superintendent of Crossroads Correctional Center, where Mr. Taylor was then incarcerated. The superintendent testified that Mr. Taylor had little opportunity to harm anyone because he was housed in administrative segregation (what lay people refer to as solitary confinement) at a high security prison. The state countered that he had killed before in a high-security prison, and might again. After closing argument, the jury unanimously recommended a sentence of death. This Court affirmed Mr. Taylor's conviction and death sentence on direct appeal. *See State v. Taylor*, 134 S.W.3d 21 (Mo. banc 2004).

Mr. Taylor then filed a motion for post-conviction relief pursuant to Rule 29.15. Mr. Taylor alleged in his motion that he received ineffective assistance of counsel at trial and that the prosecution failed to turn over favorable evidence in violation of his right to due process. After an evidentiary hearing, the motion court denied relief.

On appeal, Mr. Taylor raises numerous points concerning both guilt and punishment.[1] Key among these are Mr. Taylor's arguments that the prosecutor violated his due process rights by failing to disclose materially favorable information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and by permitting knowingly false testimony to be presented to the jury without correction, and that his trial attorneys provided ineffective assistance when they failed in large part to impeach Mr. Perschbacher.

## II. THE STATE VIOLATED BRADY BY FAILING TO TURN OVER FAVORABLE MATERIAL IMPEACHMENT EVIDENCE

Mr. Taylor argues that the motion court clearly erred when it denied

---

1. He raises a total of twenty-five separate points, but many of them present overlapping arguments and will be addressed together.

relief on his claims that the prosecution destroyed and failed to turn over materially favorable evidence to the defense prior to trial. "Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), due process is violated when the prosecutor suppresses evidence that is favorable to the defendant and material to either guilt or punishment." *State v. Salter,* 250 S.W.3d 705, 714 (Mo. banc 2008). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Anderson v. State,* 196 S.W.3d 28, 36–37 (Mo. banc 2006).

■ Mr. Taylor argues that the State improperly failed to disclose three key pieces of evidence: (1) letters that Mr. Perschbacher, the state's jailhouse witness, sent to Mr. Dresselhaus, the lead investigator for the prosecutor on this case, that Mr. Dresselhaus then destroyed without turning them over to the defense; (2) a memorandum that Mr. Dresselhaus composed memorializing one of his conversations with Mr. Perschbacher in which the latter referenced the likelihood of his testimony being needed against Mr. Taylor and contained false allegations of corruption on the part of two police officers; and (3) the state's intention to ask prosecutors to extend favorable treatment to Mr. Persch-

bacher on his pending charges if he gave helpful testimony against Mr. Taylor.[2]

*A. The State Was Obligated to Disclose the Fact of the Destroyed Letters and Dresselhaus Memorandum*

■ Under the Missouri rules, upon the request of the defendant, without the need for a court order, the state is obligated to disclose the "written and recorded statements" of witnesses it intends to call as well as "memoranda reporting or summarizing part or all of [a witness's] oral statements". Rule 25.03(A). In addition, due process requires that the state "must disclose exculpatory evidence, including evidence that may be used to impeach a government witness." *Williams v. State,* 168 S.W.3d 433, 439 (Mo. banc 2005). In this case, Mr. Taylor requested that the state disclose all witness statements. Prior to trial, the defense sought to exclude Mr. Perschbacher as a witness because the state had not provided complete disclosure of his prior statements in his letters to prosecutors.

■ On a hearing on that motion, Mr. Ahsens represented that the state "dug through [its] files" and "everything we have [regarding Mr. Perschbacher] ... has been given to them." The trial court ordered Mr. Ahsens to investigate whether Mr. Perschbacher had written any additional letters that had not been disclosed to Mr. Taylor. The trial court further ordered the state "to produce any correspondence they may have or to say what happened to the correspondence if they got it."

Mr. Dresselhaus, the lead investigator for the prosecution in Mr. Taylor's trial, in fact had received dozens of letters from Mr. Perschbacher. Despite the court or-

---

**2.** Mr. Taylor raises these as separate points on appeal, but the Court will consolidate them here for analysis.

der directing the state to disclose "what happened to the correspondence if they got it," it made no further disclosures regarding Mr. Perschbacher's letters. It did not inform either defense counsel or the judge that "a lot of Perschbacher letters" had been received and destroyed.

At the evidentiary hearing on Mr. Taylor's post-conviction motion, Mr. Dresselhaus testified that he threw some of Mr. Perschbacher's letters away prior to Mr. Taylor's trial without disclosing them to the defense. He testified that no letter was case-specific, and that he considered them a nuisance, so he disposed of them once he was able to ascertain that they did not require an immediate response. When pressed as to how many of Mr. Perschbacher's letters were thrown away, Mr. Dresselhaus averred, "I have no bloody—I have no idea how many were received," but he agreed that it was "a lot."

As the Perschbacher letters were thrown away, it is beyond dispute that they were not disclosed to Mr. Taylor. It is also self-evident that they were required to be disclosed to the defense by Missouri's rules of discovery and the explicit order of the trial court. The trial court's order that the fate of Mr. Perschbacher's letters should be disclosed, even if the letters themselves were unavailable, makes clear that the very fact of their destruction was favorable evidence that was required to be disclosed to the defense.

The state also intentionally failed to disclose a memorandum that Mr. Dresselhaus composed regarding an April 2001 interview he conducted with Mr. Perschbacher.

This memorandum plainly was within the scope of the disclosure required by the rules and the trial court's order. Yet, again, despite representing to the court and defense counsel that the state had disclosed "everything we have," Mr. Ahsens testified at the evidentiary hearing on this motion that he had a copy of this memorandum prior to trial and he made a conscious *choice* not to disclose it to the defense (or the court). At the motion hearing, Mr. Ahsens testified that he did so because he *personally* "saw no relevance whatsoever to [Mr. Taylor's] case" in the memorandum. Mr. Ahsens so testified, and so concluded, despite the express statement in the memorandum that Mr. Perschbacher's information about the Taylor homicide "could become important and it might become necessary for him to testify."

 Mr. Ahsens also testified that disclosure of the memorandum might reveal information about an ongoing highway patrol investigation into the truth of Mr. Perschbacher's allegations. In other words, the police were investigating whether Mr. Perschbacher's prior allegations were false, and Mr. Ahsens did not want to reveal this while the investigation was ongoing.[3] He made the choice not to disclose this memorandum despite the direct order of the trial court to produce all such evidence. No request was made for an *in camera* review of the memorandum by the trial court or for guidance by that court as to whether the memorandum could be excluded from the production the court had required.[4]

---

3. Mr. Taylor raises as a separate point that the motion court clearly erred in failing to order discovery regarding the outcome of this investigation. This Court does not find that this discovery order represents clear error, and the point is denied.

4. If the prosecutor believed that there were valid reasons not to disclose the documents publicly, the proper course was to seek an order of protection from the trial court, *in camera* or possibly *ex parte* if need be, preventing the document's disclosure or, if dis-

■ Despite this evidence, the motion court adopted the prosecution's self-serving finding that his failure to disclose this memorandum was made in good faith. This was clear error. Neither the prosecution nor the defense has the authority to knowingly overrule a direct ruling by the trial court or to intentionally disobey this Court's rules designed to protect the integrity of the process. Here, this Court's rules and a direct order of the trial court required the document to be disclosed. The prosecutor's purposeful decision not to comply with the order or reveal his decision not to produce the document to the court simply is not an error that can be made in good faith.

B. *The Prosecutor's Letter on Behalf of Mr. Perschbacher Would Also Have Been Relevant Impeachment Evidence*

■ At Mr. Taylor's trial, defense counsel elicited testimony from Mr. Perschbacher that he had requested favors from the prosecution at various times. At the time of the trial, Mr. Perschbacher had at least four felony charges pending: first-degree burglary, second-degree robbery, and two counts of second-degree burglary. Mr. Perschbacher insisted that none of the favors he requested were connected to his testimony against Mr. Taylor. Defense counsel could and did argue to the jury in closing that Mr. Perschbacher should not be believed in part because he's "getting the best deal of his life" on his pending charges. But, Mr. Ahsens, in his rebuttal closing argument, stated to the jury, which was instructed to disregard the remark, that "there was no deal" with Mr. Perschbacher and that he was not a liar.

These events would not be of particular significance except for certain facts that came out at the evidentiary hearing on this motion. Three weeks after Mr. Perschbacher testified, Mr. Ahsens sent a letter to the prosecutor in the county where Mr. Perschbacher had charges pending. The letter stated that Mr. Perschbacher, "without requesting reward or being promised any benefit, testified for the state ... [and] [t]hat testimony was helpful in attacking the defendant's claim of mental disease or defect and aided us in successfully prosecuting the case." Mr. Ahsens concluded the letter by stating that "fundamental fairness dictates I inform you of his cooperation for whatever weight you think it deserves." This letter was sent after the jury returned its verdict and recommended sentence, but before Mr. Taylor was finally sentenced.

■ At the evidentiary hearing on this motion, Mr. Ahsens testified that he did not disclose his intention to write this letter to Mr. Taylor's defense counsel because he "had not resolved to do so" at the time of the trial. According to Mr. Ahsens testimony, he resolved to write the letter "probably at or shortly before [he] wrote the letter." [5] Accepting the motion court's

---

closed, that its use and disclosure be limited to the pending matter.

5. Mr. Taylor urges that this evidence proves that a deal for leniency in fact existed at the time of trial and it was a violation of due process not to disclose that deal to the defense. Defendant is correct that "[p]romises of leniency or other "deals" with witnesses are among the types of evidence that must be disclosed...." *Middleton v. State*, 103 S.W.3d 726, 733 (Mo. banc 2003). The facts before the motion court are certainly amena-

ble to a conclusion that Mr. Ahsens offered to write a favorable letter for Mr. Perschbacher in exchange for his testimony, particularly when considering that Mr. Taylor showed that two previous death penalty cases *also tried by Mr. Ahsens* had to be reversed based on similar misconduct. *See State v. Barton*, 240 S.W.3d 693, 701 (Mo. banc 2007) (noting that the previous conviction was overturned due to this failure, as well as the prosecutor's presentation of knowingly perjured testimony); *see also Tisius v. State*, 183 S.W.3d 207, 211

conclusion that there was no actual deal, Mr. Ahsens' testimony at this hearing shows that he was considering whether to write such a letter during the trial, even if he did not make the final decision until after he had heard Mr. Perschbacher's testimony. The very fact that the prosecutor apparently waited to see what Mr. Perschbacher would say, a witness who repeatedly asked for deals in return for information, was relevant impeachment evidence, however, for defense counsel could argue it gave him an incentive to testify strongly.

*C. Failure to Disclose Key* Brady *Impeachment Evidence About Perschbacher Was Material in the Penalty but not the Guilt Phase*

██ Having shown that the prosecution requested favorable treatment for Mr. Perschbacher shortly after the jury trial concluded, failed to disclose Mr. Dresselhaus' memorandum, and failed to reveal the fact that Mr. Dresselhaus destroyed some of Mr. Perschbacher's letters, or to describe the contents of those destroyed letters, the question becomes whether these failures were material to this case. Mr. Taylor's due process rights are violated if the suppressed evidence "is material to either guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

Although Mr. Perschbacher's testimony was presented to the jury during the guilt

phase, the trial court instructed the jury, as required by law, that it may "consider all of the evidence presented in both the beginning and punishment stages of trial" in its penalty phase deliberations. See MAI–CR 3d 313.44A. Consequently, the Court must evaluate the materiality of the suppressed impeachment evidence with respect to both the guilt phase and the penalty phase of Mr. Taylor's trial.[6] "Evidence is material only when there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense." *Salter,* 250 S.W.3d at 715.

██ Here, although the state had told the jury that Mr. Perschbacher was credible and should be believed despite his impeachment on collateral matters, the court adopted its proposed findings that Mr. Perschbacher was so impeached in unrelated ways that he had been thoroughly discredited and the jury would have found him not believable. In particular, Mr. Taylor's attorneys had elicited testimony that Mr. Perschbacher was a white separatist and that the most renowned racial epithet for black people was a regular part of his vocabulary. Mr. Taylor's attorneys also impeached Mr. Perschbacher with his criminal history, drug abuse, and his many conduct violations during his periods of incarceration.[7]

(Mo. banc 2006) (noting that motion court remanded the case for a new penalty phase based on prosecutorial misconduct of Mr. Ahsens). But, it is up to the motion court to judge credibility, and on this record this Court cannot conclude that the motion court clearly erred in concluding that Mr. Ahsens and Mr. Perschbacher did not have an agreement for favorable treatment prior to his testimony, although, as noted, the admissions on the record make clear Mr. Perschbacher asked for favorable treatment as a regular matter when offering information about other inmates. Since this Court cannot conclude that there was an agreement for leniency, Mr.

Taylor's related point on appeal that the prosecutor elicited perjured testimony regarding this alleged deal has no merit.

6. The Court notes that the motion court, in its findings of fact and conclusions of law, did not evaluate the materiality of each of these proceedings separately.

7. Mr. Taylor separately argues on appeal that the prosecutor violated his due process rights by failing to correct the false testimony of Mr. Perschbacher related to certain of his conduct violations. There is no due process violation with respect to those lies because defense

■ But, the motion court's conclusion that the additional suppressed impeachment materials on the core issue of credibility were not material because the impeachment that was accomplished of Mr. Perschbacher was sufficient was clear error. It is well-established that the fact that a witness was impeached in other ways does not conclude the materiality inquiry required under *Brady*. This Court has specifically recognized that impeachment evidence is not cumulative "when it goes to the very root of the matter in controversy or relates to the main issue." *Black v. State*, 151 S.W.3d 49, 56 (Mo. banc 2004). This is because, by their very nature, a witness' "accuracy, veracity or credibility . . . are not collateral [issues]." *Id.*

The United States Supreme Court rejected an argument nearly identical to that made by the state, that suppressed impeachment evidence was not material because the witness was already impeached on other matters, in *Banks v. Dretke*, 540 U.S. 668, 702, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). In *Banks*, the state offered testimony from a jailhouse informant, but did not disclose to the defendant that the informant was receiving compensation in exchange for his testimony. Without the suppressed evidence, the informant was nonetheless impeached with evidence of his prior convictions, his poor reputation for truthfulness, his drug abuse, and his repeated pattern of falsifying pharmaceutical information. The state argued, and the Fifth Circuit concluded, that the suppressed evidence was "merely cumulative" impeachment information that did not satisfy the materiality threshold.

The United States Supreme Court reversed the Fifth Circuit and rejected the state's argument. It held that the impeachment evidence that had been admitted was not "directly relevant to [the informant's] part in Banks's trial" and that "one could not plausibly deny the existence of the requisite 'reasonable probability of a different result' had the suppressed information been disclosed to the defense." *Banks*, 540 U.S. at 702–03, 124 S.Ct. 1256.

Under *Banks*, the simple fact that Mr. Perschbacher was impeached in other ways is not sufficient to conclude that the suppressed impeachment evidence was not material. In determining whether the suppressed impeachment evidence was material, the reviewing court must evaluate not only the ways that Mr. Perschbacher *was* impeached, but also the ways that he was *not* impeached that would have been available had this evidence been disclosed.

While the impeachment at trial was significant, it all amounted to general impeachment of Mr. Perschbacher's character. None of this impeachment evidence, with the possible exception of his solicitation of favors from the prosecution, was specific to his general reputation for truthfulness. Even on the solicitation of favors issue, as the state denied he had solicited favors here, the fact that he had done so repeatedly in the past, as the destroyed letters would have shown, was in itself relevant to his credibility. Similarly, the testimony that Mr. Perschbacher is a racist, for example, provides a reason that he might be biased against Mr. Taylor, but it does not provide a separate reason to

---

counsel elicited the testimony and had records that they could have used to impeach Mr. Perschbacher's statements if they so chose. This is different from where the state elicits false testimony and has not provided the defense with the information to impeach

the witness; under those circumstances, the prosecution would be obligated by the due process clause to correct it. *See Napue v. Illinois*, 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

doubt his credibility, and its significance is muted, and was downplayed by the prosecution (both to the judge prior to trial in resisting entry of an order requiring the state to produce the very documents the prosecution later withheld anyway and to the jury in penalty phase closing), because the victim also was black. Similarly, the evidence of his criminal history and conduct violations impeach Mr. Perschbacher's general background, but they do not attest directly to his veracity, as would have the undisclosed materials.

None of the impeachment evidence before the jury demonstrated what the suppressed evidence shows: that Mr. Perschbacher has a documented history of lying to the state in an effort to obtain favorable treatment. Had defense counsel received Mr. Dresselhaus' memorandum, they could have pursued on cross-examination the truthfulness of those prior allegations made against police officers. If Mr. Perschbacher denied that the allegations were false, Mr. Taylor could have sought to present extrinsic evidence on the prior false allegations. *See State v. Couch*, 256 S.W.3d 64, 68 (Mo. banc 2008). Indeed, Mr. Taylor's post-conviction motion counsel deposed these officers, and both denied the allegations. Mr. Taylor could then argue that Perschbacher's allegations about Mr. Taylor feigning mental illness were similarly false and made for the same reason: to obtain favorable treatment from the state.

Even without this suppressed evidence, Mr. Taylor's counsel of course could, and did, argue to the jury that Mr. Perschbacher was not to be believed. Absent the evidence of these prior false allegations made with the expectation of receiving favorable treatment from the state, and the evidence that he had previously and repeatedly offered to testify in return for favorable treatment, however, counsel's arguments about Mr. Perschbacher's credibility were deprived of significant evidentiary force.

Similarly, the failure to disclose the fact that Mr. Dresselhaus destroyed many of Mr. Perschbacher's letters deprived Mr. Taylor of critical impeachment evidence. If this evidence had been disclosed, the state may not have been able to argue that Mr. Perschbacher was a "bonus" who confirmed their experts' accounts. He can only be portrayed as a "bonus" if one disregards (by suppression) the dozens of "nuisance" letters, many requesting favors, that he sent to Mr. Dresselhaus. Moreover, the prosecutor's argument that Mr. Perschbacher has "no reason to lie" would be deprived of much of its force, as the suppressed letters and memorandum together would have shown that he makes a habit of lying so frequently that his letters are more likely to be discarded than they are to be believed. Knowledge of these facts could have significantly undermined the legitimacy of Mr. Perschbacher's testimony and involvement in the case in a way that no other impeachment presented was able to do. Having failed to disclose this impeachment evidence, the state was able to claim much greater credibility from Mr. Perschbacher's testimony than the true facts would have warranted.

*D. Prejudicial Effect of Undisclosed Brady Material*

The Court now turns to the ultimate inquiry: whether the suppression of this evidence sufficiently prejudiced the defense that either a new trial or a new penalty phase is warranted. To answer this question requires looking at the way that Mr. Perschbacher was used as a witness by the prosecution in both the guilt phase and the penalty phase of the trial.

In the guilt phase, there was no legitimate dispute regarding the basic

facts of the crime. Indeed, Mr. Taylor's counsel admitted in opening argument that Mr. Taylor killed Mr. Thomas. The task of the jury, then, was a limited one: to determine whether Mr. Taylor, at the time of the crime, was capable of knowing and appreciating the nature, quality or wrongfulness of his conduct. Sec. 552.030.1. "If this defense is successful, the defendant is not found criminally responsible for his conduct." *Walkup*, 220 S.W.3d at 754. This exception to criminal liability, however, is a narrow one. Although the defense succeeds in appropriate cases, *see, e.g.,* *State v. Watkins,* 102 S.W.3d 570 (Mo.App. S.D.2003); *State v. Gratts,* 112 S.W.3d 12, 13–14 (Mo.App. W.D.2003); *State v. Weekly,* 107 S.W.3d 340, 342 (Mo.App. W.D. 2003) (all noting that defendant was acquitted by reason of mental disease or defect), it is difficult to prove, and it always requires expert testimony.

Consequently, the bulk of the evidence during the guilt phase came from expert witnesses for the defense and the state. Although all five of the experts that Mr. Taylor presented (four of whom had been employed by the state to treat him at Fulton and Potosi) testified that he was profoundly mentally ill with a psychotic disorder, only one testified affirmatively that at the time of the crime Mr. Taylor was unable to appreciate the nature, quality or wrongfulness of his conduct. The state's experts each testified as to their belief that Mr. Taylor was not mentally ill.

After summarizing the testimony of the state's experts during his closing argument at the guilt phase, Mr. Ahsens argued, "Frankly, on top of all of that Scott Perschbacher is a bonus in the process of investigating this case." Mr. Taylor argues that this description of Mr. Perschbacher as a "bonus" signifies that Mr. Perschbacher's testimony was vital to the outcome of the guilt phase. This Court reaches the opposite conclusion: rather than trying to emphasize Mr. Perschbacher's testimony, the prosecutor was arguing that it was confirming, but not essential, to a finding of guilt because, although his testimony that Mr. Taylor was faking his mental illness buttressed the state's experts conclusions, it was not paramount to the narrow question that was the only one at issue at the guilt phase.

In regard to that narrow question, this Court agrees. Mr. Taylor admitted the killing. The only issue was whether he knew right from wrong. There was substantial evidence that Mr. Taylor suffered serious mental illness, evidence that Mr. Perschbacher's testimony seriously undercut. But, merely believing that Mr. Taylor had a serious mental illness may not have been sufficient to persuade the jury that Mr. Taylor, at the time of the crime, did not appreciate the wrongfulness of his conduct. Indeed, the fact that Mr. Taylor himself triggered the alarm to notify the correctional officers of his cellmate's death suggests that he knew it was wrong. In light of the weight of the testimony of the state's experts on these issues, the fact that only one of Mr. Taylor's own experts concluded that he did not know right from wrong, the facts and circumstances of the actual offense, and the narrowness of the exception for a defense of mental disease or defect excluding responsibility, the Court cannot conclude that the motion court clearly erred in concluding that there was not a reasonable probability that the result of the guilt phase of Mr. Taylor's trial would have been different had the evidence been disclosed.

■ The penalty phase, however, is a different matter. During the penalty phase, the jury is charged with the much broader task of considering Mr. Taylor's mental health and mental illness for purposes of mitigation. For this reason, in-

stead of simply trying to determine whether Mr. Taylor could appreciate the wrongfulness of his conduct at the time of the offense, the jury specifically was instructed to consider two statutory mitigating circumstances: whether Mr. Taylor committed the murder while "under the influence of extreme mental or emotional disturbance" and whether his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." The jury must also consider non-statutory mitigating circumstances if they are offered, such as the defendant's early childhood abuse and mental illness, in assessing the punishment. *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (the jury's consideration of circumstances in mitigation cannot constitutionally be limited).

Defendant presented substantial expert testimony on these issues. The expert testimony demonstrated that Mr. Taylor was born into a household where he was subjected to extreme physical abuse at the hands of his father and his mother. At an early age, he was recommended for mental health treatment by counselors and other professionals. Mr. Taylor was placed in a residential mental health facility for a month at the age of 12 to receive treatment for auditory hallucinations and suicidal tendencies. At age 18, while incarcerated for murdering one of his high school classmates, he was treated at Fulton State Hospital, where he was diagnosed with depressive disorder with psychotic features. After the murder of Mr. Thomas, he was evaluated again at Fulton State Hospital, and the prison psychiatrists each concluded that Mr. Taylor suffered from paranoid schizophrenia. Indeed, four of the five experts that Mr. Taylor presented evaluated, diagnosed and treated him for serious mental illness

while they were in the employ of the department of corrections.

In this context, then, the testimony of Mr. Perschbacher takes on a much deeper significance, as it goes to the separate issue whether Mr. Taylor was afflicted with the degree of mental illness that, under Missouri's statutorily adopted mitigating factors, constitutes mitigating evidence the jury should consider in deciding whether to impose a punishment other than death. *See* Sec. 565.032.3(2), (6). "Although the State's experts may have been successful in undermining [the defendant's] claim to insanity, they did not necessarily undermine the potential mitigating effect of [defendant's] mental health evidence." *Bell v. Cone,* 535 U.S. 685, 706 n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (Stevens, J., dissenting).

As if to demonstrate the heightened importance of Mr. Perschbacher's testimony at this stage of the trial, Mr. Ahsens did not limit his argument in the penalty phase to the statement that Mr. Perschbacher's testimony was a "bonus." Rather, he urged the jury during his penalty phase closing argument that while Mr. Perschbacher might be a racist, that did not mean he was a liar, and he had "no reason to lie." Similarly, as noted, he told the prosecutor who was reviewing pending charges against Mr. Perschbacher that the latter had been an aid in the successful prosecution of the trial and fairness demanded his help be considered. The prosecutor's representations to the court and to the jury in the penalty phase argument, and to the local prosecutor after trial, are inconsistent with the state's present argument that the impeachment of Mr. Perschbacher was so complete that the jury would have rejected him and his testimony completely.

The available impeachment evidence that was not disclosed to the defendant

would have demonstrated both that Mr. Perschbacher had a reason to lie and that he had made false allegations under similar circumstances in the past. Moreover, it would have demonstrated that Mr. Perschbacher's stories were so incredible that the State, although under an obligation to disclose his written statements, often threw them away as being worthless. This would have changed the complexion of the entire penalty phase of the trial. Without Mr. Perschbacher's testimony, the substantial evidence that Mr. Taylor had suffered serious mental illness since childhood and had been found to be seriously mentally ill and was receiving treatment from state doctors even up to and during trial would have taken on far greater significance.

The importance of such impeachment evidence is heightened by the fact that the only evidence that the defense put on during the penalty phase was the videotaped deposition testimony of the superintendent of the prison where Mr. Taylor was then incarcerated as to the minimal risks Mr. Taylor presented to other inmates or correctional officers under the conditions of his confinement. Defense counsel did then tell the jurors that they should also consider all the evidence put on during the guilt phase about Mr. Taylor's mental illness, his childhood, and other mitigating factors. But, as the jury had just rejected this evidence as proof that defendant was not guilty by reason of mental disease or defect, it needed a separate framework through which to understand the potential mitigating effect of this same evidence, how his mental illness and childhood abuse

might support a finding that a life sentence was appropriate. Indeed, Mr. Taylor argues that counsel was ineffective at the penalty phase for failing to offer additional evidence in mitigation.[8]

Particularly in the absence of other penalty phase evidence, impeachment of Mr. Perschbacher as a liar who had made false claims in the past in order to obtain benefits, could have made a material difference to the jury. Had he been impeached with this evidence, there is a reasonable likelihood that the outcome of Mr. Taylor's penalty phase would have been different. The motion court clearly erred in concluding otherwise.

## III. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

██ Mr. Taylor separately argues that the motion court clearly erred in concluding that his trial counsel provided effective assistance. In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

██ With regard to the guilt phase of the trial, this Court agrees with the motion court that trial counsel's performance met the requirements of the Sixth Amendment. As set forth in the discussion of Mr. Taylor's *Brady* claim above, the issue at the

---

**8.** As will be discussed below in the analysis of Mr. Taylor's ineffectiveness claim, trial counsel failed to present testimony from those members of his family, teachers, and social workers who knew Mr. Taylor as a child, who could have described from their personal experience the gruesome details of Mr. Taylor's abusive upbringing. Trial counsel also failed to introduce Mr. Taylor's medical and educational records as exhibits, leaving jurors bereft of the only evidence they requested from the Court during their guilt phase deliberations.

guilt phase was narrow: did Mr. Taylor have the capacity to appreciate the wrongfulness of his conduct at the time of the murder. Defense counsel presented testimony from which the jury could have concluded that was the case. They also did an adequate job of impeaching Mr. Perschbacher with the evidence that was not suppressed. Finally, their failures to object to certain arguments from the prosecutor were not deficient performance. None of the remarks, including the statement during voir dire that Missouri does not have the same problems in its death penalty procedures that Illinois has, were so inflammatory that the Court can conclude that it was deficient performance not to object to the remarks. In short, defense counsel's performance at the guilt phase was within the range of reasonably competent counsel. While different counsel may have made different decisions regarding the presentation of evidence and the impeachment of Mr. Perschbacher, the standard for counsel's performance is an "objective standard of reasonableness." This Court cannot conclude that counsel's performance at the guilt phase of Mr. Taylor's trial, where they presented testimony from five experts relating to Mr. Taylor's mental disease or defect, was deficient.

With respect to the penalty phase, however, the Court concludes that the motion court's conclusion that Mr. Taylor's counsel were not ineffective was clearly erroneous. As will be detailed below, the amount of mitigation evidence available to trial counsel in this case was extraordinary. Due to counsel's unprofessional failures, however, the jurors only heard a small fraction of this evidence, and they heard literally none of it during the penalty phase of Mr. Taylor's trial. If they had been presented with this evidence during the penalty phase, there is a reasonable likelihood that the outcome of the proceeding would have been different.

### A. Constitutional Standards for Performance of Defense Counsel

The Sixth Amendment affords all citizens facing criminal charges the right to effective assistance of counsel. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. The proper measure of defense counsel's performance is reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. It is well-established that effective representation under the Sixth Amendment requires counsel to appropriately investigate, prepare, and present the client's case.

Because of the unique nature of capital sentencing—both the stakes and the character of the evidence to be presented—capital defense counsel have a heightened duty to present mitigation evidence to the jury. *See Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (because the focus of capital penalty phase proceedings is on the defendant's personal culpability, the sentencing jury must have the opportunity to evaluate the "character and record of the individual offender," as well as the "circumstances of the particular offense."); *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("evidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse").

In a trilogy of recent decisions, the United States Supreme Court has further clarified the constitutional obligations imposed on capital defense counsel in penalty phase proceedings. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins v. Smith,* 539 U.S. 510,

123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In each of those cases, the Court emphasized the duty of capital defense counsel to investigate and present mitigating evidence regarding the capital client's background. In *Williams,* a case in which the evidence in aggravation was extreme, the Court reversed the defendant's sentence because his counsel failed to present mitigation evidence regarding his life history. 529 U.S. at 398–99, 120 S.Ct. 1495. The Court noted, in particular, that defense counsel failed to present available evidence relating to the physical abuse and neglect the defendant experienced as a child. *Id.* at 395, 120 S.Ct. 1495. In *Wiggins,* the Court confirmed that an attorney has an affirmative obligation to investigate and present mitigation evidence to the jury at the penalty phase relating to the defendant's background. 539 U.S. at 534, 123 S.Ct. 2527. Even more recently, in *Rompilla,* the Court reversed a death sentence because defense counsel failed to present evidence relating to the defendant's background and mental health. *Rompilla,* 545 U.S. at 392–93, 125 S.Ct. 2456.

*B. Counsel's Representation During the Penalty Phase Fell Beneath the Standards of Competency Required by the Sixth Amendment*

 The only witness that defense counsel called during the penalty phase of Mr. Taylor's trial was the superintendent of Crossroads Correctional Center. The superintendent testified that Mr. Taylor would be housed in administrative segregation, potentially for the duration of his life-without-parole sentence. Under those conditions, the superintendent averred that defendant's ability to be a danger to others was minimal. Of course, the murder for which Mr. Taylor had just been convicted occurred in a maximum security prison under only slightly less restrictive conditions than those in which he was incarcerated at the time of trial, a fact the prosecution emphasized in rebuttal.

Had there been no other available evidence in mitigation, perhaps presenting this as the only testimony would have been reasonable. But in Mr. Taylor's case, defense counsel had abundant mitigation evidence available that they failed to present to the jury. Where this evidence is available, and the jury has recently convicted a defendant of first-degree murder while in a maximum security prison, it is not reasonable for defense counsel to only present mitigation evidence that the defendant is unlikely to commit crimes in prison.

Of course, defense counsel was entitled to—and did—rely on the evidence presented at the first phase of the trial during the penalty phase. Because the issue in the guilt phase was narrower, however, four of their five experts were not permitted to testify broadly as to their diagnosis and treatment of Mr. Taylor. The sole expert that concluded that Mr. Taylor lacked the capacity to appreciate the wrongfulness of his conduct at the time of the crime was Dr. Rabun. The other four experts, each of whom was responsible for diagnosing and treating Mr. Taylor while he was incarcerated, were only permitted to testify regarding those aspects of their reports that Dr. Rabun relied upon. As the trial court ruled in reference to Dr. Eikermann's testimony, defense counsel could only inquire as to those things "that were reflected in the records that Rabun reviewed and relied on, but not anything extraneous to those records." This meant that, at the guilt phase, the jury could only use these experts' testimony as collateral support for Dr. Rabun's ultimate conclusion regarding Mr. Taylor's capacity at the time of the crime.

In the penalty phase of the trial, these other experts' testimony could have been proffered for their own merit, as evidence of Mr. Taylor's history of mental illness. The limitations that the trial court imposed upon their testimony would have vanished. Moreover, the jurors would have been presented with this broader testimony at a time when their instructions would have permitted them to give mitigating effect to their conclusions about Mr. Taylor's history of mental illness—testimony that in itself provided no defense in the guilt phase. Due to counsel's unprofessional choice to present only the prison superintendent at the penalty phase, however, the jury was not given this opportunity.

One of the defense experts, Dr. Rabun, had presented testimony in the guilt phase regarding Mr. Taylor's abusive upbringing and other difficulties in childhood. Through his testimony, some of the available mitigation evidence regarding Mr. Taylor's life was before the jury when deciding whether a recommendation of death was warranted. However, Dr. Rabun's testimony was provided primarily to support his conclusion at the guilt phase that Mr. Taylor lacked the capacity to appreciate the wrongfulness of his conduct at the time of the crime. Consequently, his testimony regarding Mr. Taylor's childhood was analogous to that of the other four experts: it offered collateral support to Dr. Rabun's ultimate conclusion. Once again, at the penalty phase of Mr. Taylor's trial, this testimony was entitled to receive independent weight and consideration as circumstances in mitigation of punishment. Reasonable trial counsel would have recognized the need to put on additional mitigation evidence regarding the defendant's character and background at the penalty phase, particularly after the jury had rejected the expert's ultimate conclusion.

Moreover, trial counsel failed to introduce into evidence any of the records on which Dr. Rabun relied in reaching his conclusions regarding Mr. Taylor's abusive background, history of mental illness, and eventual diagnosis. This failure at the penalty phase is particularly profound since the jury had asked to review these records during the guilt phase of the trial. Despite the jury's specific desire to see these available records, which were replete with statements showing Mr. Taylor had suffered from mental illness since long before the murder, counsel made no attempt to fill this evidentiary void by introducing them in the penalty phase.

During the evidentiary hearing on this motion, trial counsel testified they did not want to introduce the records because they felt the records contained some harmful information. While not all of the evidence in the records was favorable to Mr. Taylor, such records seldom are. Where the only basis of defense is that one's client has long had a mental illness that reduces his responsibility, the failure to introduce records that present not only support for his history of mental health evaluations and treatment beginning at the extremely young age of 7, but also a treasure trove of mitigation regarding Mr. Taylor's abusive childhood, simply is not a reasonable trial strategy. "Foregoing mitigation because it contains something harmful is not reasonable when its prejudicial effect may be outweighed by the mitigating value." *Hutchison v. State*, 150 S.W.3d 292, 304–05 (Mo. banc 2004). *See also Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (reversing death sentence where counsel failed to present mitigating evidence even though "not all of the additional evidence was favorable to [the defendant]"). "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the

prosecution's death-eligibility case." *Williams, Id.* at 398, 120 S.Ct. 1495.

In short, counsel's performance at the penalty phase of Mr. Taylor's trial did not satisfy the standards of the Sixth Amendment. "Given both the nature and the extent of the abuse petitioner suffered, we find ... that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." *Wiggins,* 539 U.S. at 535, 123 S.Ct. 2527.

*C. Had Counsel Presented the Available Mitigating Evidence to the Jury at the Penalty Phase, there is a Reasonable Probability that the Outcome of the Proceeding Would Have Been Different*

 Having concluded that counsel's performance at the penalty phase was deficient, this Court must evaluate whether that performance prejudiced Mr. Taylor. In this context, the question for the Court is whether there is a reasonable probability that the outcome of the penalty phase proceeding would have been different. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527.

 The evidence in aggravation in this case was significant. In addition to the circumstances of Mr. Thomas' murder, the state also described Mr. Taylor's previous first-degree murder conviction of a 15–year old classmate. The jury was presented with evidence that Mr. Taylor twice committed premeditated murder, both times strangling his victims to death, both times having sexual encounters with the victims either prior to or during the killing. These are serious facts in aggravation. But the presence of significant aggravation does not foreclose the prejudice inquiry. There is no crime that, by virtue of its aggravated nature standing alone, automatically warrants a punishment of death. *See Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (holding that Eighth Amendment requires "the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death").

The available evidence in mitigation also was extensive. Defense counsel could have called additional mitigation witnesses to testify during the penalty phase of the trial, including several of Mr. Taylor's family members, all of whom were available to testify. Yvonne Searcy, Mr. Taylor's aunt on his father's side, often babysat Mr. Taylor as a young child and was, therefore, present several times when his father (her own brother) beat him with a coat hanger. Ms. Searcy could also have testified that Mr. Taylor's mother sought to defend him, only to herself be beaten. Ms. Searcy also could have buttressed the testimony of Mr. Taylor's experts regarding the early onset of his mental illness. She recalled that Mr. Taylor heard voices from his "father of darkness" at the age of 11 or 12, and she could have testified that Mr. Taylor's "demons" were so bad that they attempted a church exorcism when he was in early adolescence. Matilda Hemphill and Joyce Stewart, Mr. Taylor's aunts on his mother's side, could have proffered similar testimony.

Mr. Taylor's mother could have been called to testify regarding these details as well. She could have told the jury about the months that she and Mr. Taylor spent living in an abuse shelter in St. Louis after she finally left Mr. Taylor's father in 1983, when Mr. Taylor was four years old. She could have testified about admitting Mr. Taylor, then age 12, to Hawthorn Hospital when he was running away from home, experiencing command hallucinations, and threatening suicide. Some of the details of

this testimony were presented at the guilt phase through Dr. Rabun, but it was not presented to the jury during the penalty phase. "A vivid description of [the defendant's] poverty-stricken childhood, particularly the physical abuse, and the assault . . ., may have influenced the jury's assessment of his moral culpability." *Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002).

Counsel failed to introduce any of Mr. Taylor's school and medical records, records that the jury specifically requested. These records reveal a child that, from an early age, struggled intensely. He failed kindergarten. The school counselor, Ciby Kimbrough, could have been called to testify regarding Mr. Taylor's suicidal behavior at age 10, when Kimbrough had to intervene to bring Mr. Taylor off the window ledge where he was threatening to jump.

From these records, the jury would also have been able to receive independent validation of the testimony of Mr. Taylor's guilt phase experts: that he had been suffering from intense mental health problems for many years before he killed Mr. Thomas. These contemporaneous records documenting Mr. Taylor's mental health problems, more than any testimony the defense offered at the guilt phase, could have persuaded the jury that the mental health evidence had value as mitigation of punishment, and that, perhaps, Mr. Taylor deserved a punishment other than death for his crime.

"Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527. If competent counsel had presented and explained the significance of all the available mitigation evidence, there is a "reasonable probability that the result of the sentencing proceeding would have been different." *Williams*, 529 U.S. at 399, 120 S.Ct. 1495 (resulting in a life sentence in Maryland; in Missouri it would result in a new penalty phase proceeding). The motion court clearly erred in concluding otherwise.

## IV. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

▇▇▇▇▇▇ Mr. Taylor argues that he received ineffective assistance of appellate counsel. As with claims of ineffective assistance of trial counsel, Mr. Taylor must demonstrate both that appellate counsel's performance was unreasonable and that appellate counsel's unreasonable failures resulted in prejudice. "To prevail on a claim of ineffective assistance of appellate counsel, the Movant must establish that counsel failed to raise a claim of error that was so obvious that a competent and effective lawyer would have recognized and asserted it." *Williams v. State*, 168 S.W.3d 433, 444 (Mo. banc 2005). Mr. Taylor must be able to establish that if counsel had raised the claims, there is a reasonable probability the outcome of the appeal would have been different. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

The claims that Mr. Taylor asserts should have been raised but were not are that his rights under the Confrontation Clause were violated by Mr. Perschbacher's testimony regarding the contents of the notes from Mr. White–Bey and by testimony from Dr. Adelstein regarding the results of an autopsy that another doctor, Dr. Dix, performed.

With respect to Dr. Adelstein's reliance on hearsay, Mr. Taylor points out that this Court recently held that it violates a defendant's rights under the Confrontation Clause for someone other than the author

of an investigatory report to testify about its contents. *See State v. March*, 216 S.W.3d 663 (Mo. banc 2007). The *March* case, however, was dictated by the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As the Court later noted, its holding in *Crawford* was "a new rule" that "was not dictated by prior precedent." *Whorton v. Bockting*, 549 U.S. 406, ——, 127 S.Ct. 1173, 1181, 167 L.Ed.2d 1 (2007). Although *Crawford* was handed down before Mr. Taylor's appellate counsel filed a reply brief in his direct appeal, this Court cannot conclude that appellate counsel's performance was deficient in failing to request permission to submit a supplemental brief on the Adelstein hearsay problem premised on the newly announced rule of *Crawford*. Indeed, as this Court recognized in *March*, "Pre-*Crawford* Missouri case law has held that laboratory reports prepared by an unavailable declarant are admissible against the defendant over a Confrontation Clause objection." 216 S.W.3d at 665. Counsel's failure to raise a hearsay argument with regard to Dr. Adelstein's testimony was not deficient.

■■■■■ It is a closer question regarding the hearsay related to Mr. Perschbacher's testimony. Assuming without deciding for the purposes of this analysis that appellate counsel should have raised the claim and that the trial court improperly admitted Mr. Perschbacher's testimony regarding Mr. White–Bey's statements,[9] appellate counsel would still have had to prove that the error was prejudicial in order to prevail. *See March*, 216 S.W.3d at 667 (holding that erroneous admissions of hearsay testimony are subject to harmless error analysis). Even if Mr. Perschbacher's testimony regarding the contents of Mr. White–Bey's note had been excluded, the jury would still have heard that Mr. Perschbacher discussed with Mr. Taylor the latter's intention to feign mental illness; and even if they disregarded Mr. Perschbacher's testimony entirely, there remains a reasonable likelihood that the jury would have concluded that Mr. Taylor had not shown he did not know right from wrong.[10]

## V. MR. TAYLOR'S CLAIM THAT HE IS INCOMPETENT TO BE EXECUTED IS NOT RIPE FOR REVIEW

■■■■■ Mr. Taylor also argues that, due to his schizophrenia and deteriorated mental state, he is not competent to be executed. *See Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). "The Eighth Amendment prohibits a state from carrying out a sentence of death upon a prisoner who is insane." *Id.*, at 409–410, 106 S.Ct. 2595. The United States Supreme Court recently revisited this requirement in *Panetti v. Quarterman*, —— U.S. ——, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) stating:

> Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition. Under

---

9. Neither of these assumptions would necessarily be borne out by a fuller analysis, but if a party fails to prove prejudice, the Court need not evaluate counsel's performance. *See Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989) ("If it is simpler to dispose of a claim of ineffectiveness on the ground of lack of sufficient prejudice, that course should be followed").

10. As this Court has already granted relief as to Mr. Taylor's sentence, it need not evaluate whether this alleged error had a prejudicial effect on Mr. Taylor's penalty phase proceeding.

*Ford*, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition. These determinations are governed by the substantive federal baseline for competency set down in *Ford*.

*Id.* at 2848. The Supreme Court also held, though, that these claims "are not ripe until after the time has run to file a first federal habeas petition." *Id.* at 2852. "All prisoners are at risk of deteriorations in their mental state." *Id.* at 2852. In general, therefore, courts are not "able to resolve a prisoner's *Ford* claim before execution is imminent." *Id.* at 2854. As this Court has reversed Mr. Taylor's sentence, this claim is not yet ripe.[11]

## VI. CONCLUSION

For the reasons set forth above, the Court affirms the judgment as to the guilt phase of the trial, but reverses the judgment as to the penalty phase. The case is remanded.

TEITELMAN and WOLFF, JJ., concur.

MOONEY, Sp.J., concurs in result.

PRICE, J., concurs in part and dissents in part in separate opinion filed.

RUSSELL, J., concurs in opinion of PRICE, J.

BRECKENRIDGE, J., not participating.

WILLIAM RAY PRICE, JR., Judge, concurring in part and dissenting in part.

I concur with that part of the majority opinion affirming the denial of relief from Mr. Taylor's conviction for murder. I dissent from that part of the majority opinion granting relief with respect to Mr. Taylor's death sentence. Mr. Taylor's trial counsel made a reasonable strategic decision not to introduce evidence in the death penalty phase that had a significant possibility of being more harmful than helpful to Mr. Taylor's defense.

Mr. Taylor was already incarcerated for the rape and murder of a 15-year-old girl in the bathroom of McCluer North High School when he murdered his cellmate, Shackrein Thomas. The evidence established that on October 3, 1999, without provocation, Mr. Taylor got out of his bed, put his shoes on for stability, and then struck Mr. Thomas in the face. A fight ensued and Mr. Taylor strangled Mr. Thomas for 10 or 15 minutes until he died. Approximately two hours later, Mr. Taylor called the prison guards to remove Mr. Thomas' body because it was in Mr. Taylor's way. Mr. Thomas' body had a bite mark in the middle of his back, a swollen left eye, a right eye nearly dislodged from its socket, and other abrasions on his abdomen and cheek. There was also evidence that a sexual act had occurred.

Mr. Taylor's defense in the guilt phase was that, by reason of mental disease or defect, he was not responsible for his actions. His attorneys introduced evidence from five mental health experts that Mr. Taylor suffered from paranoid schizophrenia, with one of the experts stating that Mr. Taylor lacked the capacity to know and appreciate the nature, quality, or wrongfulness of his acts. The jury rejected this defense.

---

**11.** This Court does not reach Mr. Taylor's other arguments regarding the death penalty; they are not ripe for review in light of this Court's reversal of his sentence.

During the penalty phase of the trial, the only evidence introduced by the prosecutor concerned Mr. Taylor's previous rape and murder of Christine Smetzer, described above. In turn, the only evidence introduced by Mr. Taylor's attorneys was the testimony of the superintendent of the Crossroads Correctional Center that Mr. Taylor could be housed in administrative segregation for the rest of his life with minimal danger to others.

The majority opinion finds that Mr. Taylor's trial counsel was ineffective for not introducing a "treasure trove" of mitigating evidence, that Mr. Taylor was abused as a child, suffered from early-onset mental illness, had struggled with school, was suicidal at age ten, etc. I disagree. Mr. Taylor's trial counsel specifically investigated and considered the possibility of introducing this evidence. Counsel made the strategic decision not to introduce this evidence, fearing that it might be more harmful than helpful to Mr. Taylor.

Specifically, concerning Mr. Taylor's mental health records, trial counsel stated:

> I mean, it would have been great if we could have introduced the records and there weren't harmful things in there. I am sure we would have. It's just that we decided that we didn't think it was the best option.

Counsel also stated:

> And there were some other—there was one person in particular that was meeting with him once a week that seemed to have some indications that she—I believe it was a woman, and I think it was a psychologist, notes like that met with him once a week—that indicated she was not convinced that he had a mental disease and that he was malingering.

Concerning Mr. Taylor's school records, trial counsel stated:

Upon looking at his behavior and upon discussing Michael's behavior with his family, one thing that we were somewhat concerned about, knowing that the onset of schizophrenia is generally late teens or early twenties would be the common onset for schizophrenia, *we were very cautious about presenting evidence that would make Michael appear to be like a bad seed from the start.* So basically looking through the school records, we just weren't that interested in putting on the school records or people involved with the school records for that reason. (Emphasis added).

Likewise, one of the exhibits Mr. Taylor now claims should have been introduced also shows that, as a ten-year-old boy, he "becomes very aggressive and can be violent." Exhibit 43 records that Mr. Taylor has "a history of uncontrollable school behavior which includes fighting, profanity, and overall disruptiveness in class." Also, certain prison documents that trial counsel chose not to introduce suggested that Mr. Taylor's symptoms may not have been genuine. For example, Exhibit 12, states:

> Although Mr. Taylor had reported a lengthy psychiatric history including many suicide attempts, he never attempted suicide while incarcerated at Potosi or Fulton. He also reported a history of self mutilation as directed by the "father of darkness," but until October 3, 1999, there were no reports of this behavior in any of the psychiatric, psychological, or medical progress notes.

Mr. Taylor's prison reports also indicate that he assaulted a guard and that a weapon was found in his cell.

Trial counsel's strategic concerns prompting them not to introduce this evidence are more than reasonable. The murder committed by Mr. Taylor was brutal and senseless. Mr. Taylor's delay in calling the guard and then calling only to

have the body removed from his way was particularly calloused. Any reference to Mr. Taylor's past would only highlight his previous murder of Christine Smetzer and add even more emotional force to the prosecutor's request for the death penalty. Instead of creating jury sympathy as the majority seems to imply, this evidence would more likely have convinced the jury that Mr. Taylor was "a bad seed from the start" for whom only the death penalty is appropriate.[1]

Trial counsel for Mr. Taylor was in an extremely difficult situation. The jury had already rejected Mr. Taylor's defense of mental disease or defect. The jury knew that Mr. Taylor had committed two atrocious murders. Whether it was better to introduce evidence of a lifetime of abuse, mental illness, violence and disruptiveness that might result in jury sympathy or might instead focus the jury upon Mr. Taylor's past, including the rape and murder of a 15–year–old girl, or whether to introduce evidence that Mr. Taylor could be safely removed from other human beings by solitary confinement is a decision no attorney would want to make. Simply because the jury imposed the death penalty does not mean that trial counsel made the wrong decision or was a constitutionally ineffective lawyer.

Mr. Taylor's trial counsel was in a better position to evaluate trial strategy than are the judges of this Court. We have consistently held that "[t]rial strategy is not ground for ineffective assistance of counsel." *Goodwin v. State*, 191 S.W.3d 20, 25 (Mo. banc 2006); *Middleton v. State*, 103 S.W.3d 726, 736 (Mo. banc 2003); *Edwards*

*v. State*, 200 S.W.3d 500, 516 (Mo. banc 2006). This is not the case to change that law.

The judgment as to the penalty phase, as well as the guilt phase, should be affirmed.

1. As to the *Brady* issue, the suppressed impeachment evidence was not material in that there is not a reasonable probability that the penalty phase would have been different if the evidence had been disclosed to the defense. The state's jailhouse witness, Perschbacher, had been already discredited by the court and found to be not credible through other impeachment. The decision by defense counsel not to put on additional mitigation evidence and to rely only upon the testimony of the superintendent of the Crossroads Correctional Center precludes the possibility that such a violation was prejudicial in the penalty phase.